**Francis G. BRAGEN, Appellant,**

v.

**HUDSON COUNTY NEWS COMPANY, Inc.**

No. 14057.

United States Court of Appeals
Third Circuit.

Argued March 18, 1963.

Decided Aug. 23, 1963.

Doane Regan, Rothbard, Harris & Oxfeld, Newark, N. J., for appellant.

Julius Kass, New York City (Jacob H. Bernstein, Perth Amboy, N. J., Bandler, Kass & Goetz, Robert Sylvor, New York City, on the brief), for appellee.

Before HASTIE, GANEY and SMITH, Circuit Judges.

GANEY, Circuit Judge.

Plaintiff, a small retailer, brought this action under § 2 of the Sherman Anti-trust Act, 15 U.S.C.A. § 2, claiming inter alia that by reason of defendant's monopolization of the distribution of the better known newspapers, magazines and paperback books in Hudson County, New Jersey, it has compelled him, as a condition of doing business with it, to accept publications which he did not order or wish to sell.[1] The complaint goes on to aver that following his rejection of delivered unordered publications, defendant has refused to supply him with the publications that he had ordered and as a result he has suffered losses and damages beginning with June of 1957. After plaintiff presented his case before a jury, the trial court rendered an oral opinion in which findings of fact were made to support its reasons for allowing defendant's motion to dismiss the complaint on the ground that plaintiff's evidence was insufficient to establish a violation of § 2 of the Antitrust Act. The court's opinion concluded as follows:

"I can find no basis whatsoever in the evidence before the Court from which an inference can be drawn that any act or omission or any course of conduct committed or followed by the defendant in this case with respect to the plaintiff from the commencement of their business relationship until its termination constituted a violation of Section 2 of the Sherman Act which inflicted damage upon the plaintiff for which he would be entitled to recover under 15 U.S.C. Section 15.

"This is a case which clearly appears to have been an unfortunate disagreement between the parties in a business relationship respecting the propriety of interest, party debits and credits * * *.

"The law is well settled that a business man, whether he acts as an individual or a corporation, whether he is a retailer or whether he is a distributor, has a perfect right to refuse to continue to deal with a customer as long as in so doing he does not conspire with others or enter into an arrangement whereby that

1. The case has been before us before on an appeal from the allowance of defendant's motion for summary judgment. See

3 Cir., 278 F.2d 615 (1960), reversing 168 F.Supp. 231 (D.C.N.J.).

customer is deprived of merchandise which would otherwise be available to the purchaser from the sources from which it emanated.

"Therefore, I must grant the motion for a dismissal with prejudice, and such will be the order."

On the basis of the opinion above, the following judgment was entered:

"The issues of the above entitled action having been regularly brought on for trial at a term of this Court and the parties having duly appeared by their respective attorneys and the allegations and proofs of the plaintiff having been heard in support of plaintiff's contentions, and the defendant having made a motion to dismiss the complaint at the conclusion of plaintiff's case and due deliberation having been had and the Court having made and filed its decision on the 17th day of January, 1962, containing findings of fact and conclusions of law thereon and directing a judgment in favor of the defendant and finding no damages in favor of the plaintiff and dismissing the complaint on the merits, it is

"ORDERED, ADJUDGED AND DECREED, that the plaintiff have no damages and that the complaint of the plaintiff be and the same hereby is dismissed on the merits, and that the defendant, Hudson County News Company, Inc. recover their costs of the plaintiff, Francis G. Bragen."

From this judgment the plaintiff appealed.

At the trial before a jury there was evidence to show the following facts:

In January of 1952, plaintiff having had no previous retail business experience, rented a small empty store at 133 Monticello Avenue, Jersey City, Hudson County, New Jersey, for the purpose of selling at retail newspapers, magazines, paperback books, comic books, tobacco, soft drinks, ice cream, candy and school supplies. Except for certain newspapers,[2] his wholesale sources of supply for the popular publications were limited to two sources: the defendant, Hudson County News Company, Inc. ("Hudson"), and the American News Company. These two companies were wholesale distributors of periodicals, such as newspapers and magazines and also paperback books and comic books. By reason of the fact that some national distributors and certain publishing companies had given Hudson permission to sell their publications, Hudson was the sole wholesale distributor for those publications in Hudson County, with the exception of East Newark, Arlington, Harrison and Kearny.[3] The American News Company furnished only a small part of the publications sold at newsstands in Hudson County.[4] Neither Hudson nor American distributed a publication in Hudson County that the other sold in that county.

Plaintiff went to Hudson and asked it to start serving him with publications in the spring of 1952. From that time Hudson sent him newspapers daily and other publications about twice a week. These deliveries came in a bundle or bundles depending on the quantity delivered. On Friday of each week, plaintiff received a bill accompanied by an invoice which listed the publications and their amount sent him during the week

2. These newspapers were: New York World-Telegram, New York Journal, Journal-American, Jersey Journal, Daily News and Sunday News.

3. Hudson distributed the following newspapers: The New York Times, The New York Herald-Tribune, New York Post, New York Mirror, Newark Star-Ledger, Newark Evening News, The Hudson Dispatch and all of the Sunday newspapers except the New York Daily News. It also distributed the publications of the Curtis Publishing Company and the Hearst Publishing Company, Mentor, Signet, Gold Medal and Popular. In addition, it distributed the following magazines: U. S. News and World Report, Newsweek, American Home, Look, Coronet, Esquire and Science and Mechanics.

4. It distributed Life, Time, Woman's Home Companion, American Magazine, Collier's and Dell comic books. It did not sell newspapers in Hudson County.

plus the newspapers and their amount which would be delivered to him on Saturday and Sunday of that week, plus a service charge. The bill would give plaintiff credit for publications which he had returned several weeks before. The bill stated: "All claims for credit must be made within seven days after receipt of this bill." The bill, as required by Hudson, was paid by plaintiff on the following Tuesday. Before the plaintiff could get credit for returns he had not ordered, he had to pack them in a box for Hudson's delivery-truck driver to pick up. He was required to itemize the returned publications on a form supplied by Hudson. After the returns had been picked up, plaintiff, as adverted to, would be required to wait several weeks until Hudson approved the amount of the return. This amount, to the extent approved by Hudson, would be deducted from a future bill.

In the beginning plaintiff accepted whatever items Hudson sent him for he did not know the sales potential of any given publication. But as time went on he became aware that Hudson was sending him more and more of the publications that would not sell in his store. At the same time, he was not getting enough of the publications for which there was a buyer demand at his store, such as The Saturday Evening Post and Mentor paperback books.

In 1953 he began requesting Hudson to discontinue delivering certain publications and to increase others. These requests were repeated many, many times in telephone conversations with Hudson and in letters written to it. When he had the time to spare, he would make a personal visit to Hudson's office in Jersey City in an attempt to stop delivery of the unwanted publications and to get the ones he wanted. His requests to stop sending him certain items which he particularized were not alone ignored, but the record discloses that whenever he appealed personally, by phone call or letter, that only materials he ordered be sent, the volume of the unwanted materials increased.

As plaintiff's protest against Hudson's sales practices increased, the quality of Hudson's service began to decrease. In delivering his bundles of publications, the driver would throw them from the delivery-truck at a place some distance from plaintiff's store, on the sidewalk, into the gutter or into a puddle of water. If it were raining at the time, the bundles were left in an unprotected location. After he complained to the Curtis Publishing Company, magazines and books were delivered inside his store by it. However, the unordered items continued to accompany those that he ordered, and on occasions, half of his billings were for unwanted materials.

Starting in 1956, he no longer paid the service charge and paid only for the merchandise which he wanted to accept. On February 7, 1957, he notified Hudson that he would, in the future, accept unordered publications on a consignment basis only. Between the fall of 1956 and June of 1957, Hudson cut off its services to plaintiff at least five times. When he inquired as to why it stopped deliveries, Hudson told him that he would not get them until he paid a balance which Hudson claimed he owed it. However, Hudson would never discuss the merits of the disputed claim with him.

In June of 1957, American News Company stopped doing business in Hudson County and Hudson took over the wholesale distribution of items formerly handled by American News and Hudson became the sole distributor for the county. In that same month, Hudson stopped delivering any publications to plaintiff. The reason it gave was that plaintiff owed it a balance of $126.19. He refused to pay that amount because he claimed that Hudson, over a period of time, had shortchanged him on credit for returned items which totaled between $550 and $600. After he was cut off by Hudson, plaintiff continued to receive those newspapers not distributed by Hudson and he began to purchase newspapers and magazines, formerly delivered by Hudson, from other retailers at retail prices. In October of 1957, since he could no longer

afford to do so at retail prices, he stopped buying magazines and customers who formerly bought those items stopped coming to his store. As a result, in addition to losing the profit on magazine sales, he made no gain on other items which were usually purchased by magazine customers. Accordingly, on March 12, 1958, the plaintiff filed this suit for treble damages pursuant to 15 U.S.C.A. § 15, and in February of 1959, his business had diminished to such a point that he was forced to close his store, while similar stores in the vicinity continued to stay open.

At the close of the plaintiff's case, the defendant filed a motion to dismiss on the ground that the plaintiff had not brought himself within the provisions of the Sherman Act.

█ The lower court erroneously treated this motion under Rule 41(b) of the Federal Rules of Civil Procedure in the same manner as a motion to dismiss in a non-jury case in that the judgment entered by the court below recited, " * * and the defendant having made a motion to dismiss the complaint at the conclusion of the plaintiff's case and due deliberation having been had and the Court having made and filed its decision on the 17th day of January, 1962, containing findings of fact and conclusions of law thereon and directing a judgment in favor of the defendant * * *." In other words, the court here, by making findings of fact and conclusions of law, trespassed the province of the jury. While there has been some confusion in the cases in connection with Rule 41(b), it is now well settled that findings of fact by a judge, in a jury case, must not be made since the court, in a jury case, serves a different function in the disposition of the motion than in a non-jury case for, in the latter, he sits as a trier of the facts as well as an arbiter of the law. This matter was thoroughly discussed in an excellent opinion by Judge Stephens, United States v. United States Gypsum Company, D.C., 67 F.Supp. 397, 417,[5] where, after reviewing the authorities, he held that in a jury case the court does not weigh or evaluate the evidence, as the weight and credibility of the evidence is for the jury, but merely determines whether there was any evidence offered by the plaintiff, viewed in the light most favorable to him, which would make out a prima facie case entitling him to go to the jury, as in the instant case, whether there was sufficient evidence of violation of § 2 of the Sherman Act to carry the case to the jury. To the same effect are Hawley v. Alaska Steamship Company, 9 Cir., 236 F.2d 307, 309; Howard Industries v. United States, 115 F.Supp. 481, 126 Ct.Cl. 283; Syquia v. United States, 124 F.Supp. 638, 645, 129 Ct.Cl. 555. Again, in Wolf v. Reynolds Electrical & Engineering Co., 9 Cir., 304 F.2d 646, which was a jury case, the Court, at p. 648, stated, "It will be noted that the provision for findings of fact is limited to actions 'tried by the court without a jury'. Where a motion for dismissal is made pursuant to Rule 41(b) in a jury case, it may properly be treated as a motion for directed verdict under Rule 50 (a). The trial court does not determine the facts, but simply determines whether plaintiff has made a 'case for the jury'."

However, since the court stated in its opinion that there was "no basis whatsoever in the evidence" which showed a violation of § 2 of the Sherman Act, we will pass over the procedural error and determine whether, on the record, there was a case made out by the plaintiff for a jury treating the evidence in a light most favorable to him.

█ At the outset, it must be stated that the mere existence of a sole distributor in a certain locality resulting from the permission granted to a single firm by a number of publishers and national distributors, not shown to be acting in concert, to sell at wholesale certain publications in that locality does not per se offend § 2 of the Sherman Antitrust Act, 15 U.S.C.A. § 2. And, on the record before us, we are unable to form an opinion

5. Later reversed on other grounds, United States v. United States Gypsum Company, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746.

one way or the other whether or not the sole wholesale distributorship of itself, here, has a pernicious effect on competition. See White Motor Co. v. United States, 372 U.S. 253, 263, 83 S.Ct. 696, 9 L.Ed.2d 738. These conclusions, however, do not put Hudson in the clear.

During the time Hudson did business with plaintiff it had undisputed control over the access to those periodicals, paperback books and comic books which it distributed. A number of these publications were of the better known variety and were in demand at retail outlets. When the American News Company discontinued servicing retail outlets other than its own, Hudson had a monopoly on the wholesale distribution in its area of virtually all the leading periodicals.

In Northern Pacific Railway Co. v. United States, 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545, the Court said with respect to tying-in arrangements:

> "They are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected. * * * Of course where the seller has no control or dominance over the tying product so that it does not represent an effectual weapon to pressure buyers into taking the tied item any restraint of trade attributable to such tying arrangements would obviously be insignificant at most. As a simple example if one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain competition in sugar if its competitors were ready and able to sell flour by itself."

To the same effect, Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 605, 73 S.Ct. 872, 878, 97 L.Ed. 1277, states:

> "Tying arrangements * * * flout the Sherman Act's policy that competition rule the marts of trade. * * * By conditioning his sale of one commodity on the purchase of another, a seller coerces the abdication of buyers' independent judgment as to the "tied" product's merits and insulates it from the competitive stresses of the open market. * * * "

which is quoted with approval in Northern Pacific Railway Co. v. United States, supra, 356 U.S. at p. 10, 78 S.Ct. at p. 520.

In our opinion, the plaintiff has made a sufficient showing which could enable a jury to find that Hudson's business with plaintiff was conducted through tying arrangements. Although Hudson agreed to give credit on returned items, the jury might have concluded on all of the evidence that the administration of this scheme was such that in actual practice the credit concession did not relieve the plaintiff of the economic burden of unwanted "tied" items.

Of course a distributor, even though it has sufficient economic power over the goods it distributes, need not deal with a buyer if he does not meet his payment requirements for the goods delivered to him or causes it too much annoyance by unfounded complaints. Here Hudson alleges it stopped dealing with plaintiff for this reason. However, the jury, under proper instructions, could have found that the real reason why Hudson stopped dealing with plaintiff was because he refused to sell or display the unwanted items and the trial judge usurped the jury's function when he found that the case was "an unfortunate disagreement between the parties in a business relationship respecting the propriety of interest, party debits and credits." The jury may well have found that the dispute over the $126.19 was a mere pretense seized upon to conceal the real reason—the plaintiff's failure to take unwanted materials. While the judgment of the lower court recites that there were no damages incurred by the plaintiff, the record discloses loss of business by him as a result of the defendant's conduct from which a jury might

well find damages, as this is the jury's function. Continental Ore Co., et al. v. Union Carbide and Carbon Corp., et al., 370 U.S. 690, 696–697, 82 S.Ct. 1404, 8 L.Ed.2d 777.

On the record here presented, the plaintiff has made a "case for the jury."

The judgment of the district court will be reversed and the case will be remanded with directions to award plaintiff a new trial.