THURMAN L. KELLY v. INTERNATIONAL HARVESTER COMPANY

No. 41

(Filed 10 March 1971)

1. **Rules of Civil Procedure § 50— ruling on directed verdict — findings of fact**

    In resolving the question whether plaintiff's evidence was sufficient to go to the jury, it was not required or appropriate that the trial court make "Findings of Fact" and state "Conclusions of Law."

2. **Rules of Civil Procedure § 50— motion for directed verdict — question presented**

    The motion for a directed verdict under Rule 50(a) presents substantially the same question as that formerly presented by a motion for judgment of involuntary nonsuit under [former] G.S. 1-183, namely, whether the evidence was sufficient to entitle the plaintiff to have the jury pass on it. G.S. 1A-1, Rule 50(a).

3. **Rules of Civil Procedure § 50— motion for directed verdict — consideration of evidence**

    On a motion by a defendant for a directed verdict in a jury case, the court must consider all the evidence in the light most favorable

Kelly v. Harvester Co.

to the plaintiff and may grant the motion only if, as a matter of law, the evidence is insufficient to justify a verdict for the plaintiff.

**4. Rules of Civil Procedure § 50— motion for directed verdict — right to jury trial**

Defendant's motion for a directed verdict does not operate as a waiver of jury trial.

**5. Rules of Civil Procedure § 50— directed verdict — role of the jury**

The granting of a motion for a directed verdict requires no perfunctory act from the jury. G.S. 1A-1, Rule 50(a).

**6. Rules of Civil Procedure §§ 41, 50— granting of directed verdict — right to judgment**

When a motion for a directed verdict under Rule 50(a) is granted, the defendant is entitled to judgment unless the court permits a voluntary dismissal of the action under Rule 41(a)(2).

**7. Rules of Civil Procedure §§ 41, 52— motion for directed verdict — findings of fact**

Rule 41(b), which requires the court to make findings of fact when rendering judgment on the merits against the plaintiff, has no application on a motion for a directed verdict in a jury trial. G.S. 1A-1, Rule 41(b) and Rule 52(a).

**8. Contracts § 32— interference with contractual rights by third persons — employment by farm equipment dealership — manufacturer's threatened termination of franchise agreement**

A plaintiff who was discharged from employment as the general manager of a farm equipment dealership failed to offer sufficient evidence that the defendant farm equipment manufacturer had wrongfully and maliciously interfered with his contract of employment with the dealership, the defendant having disapproved of the plaintiff's employment and having threatened the immediate cancellation of the dealership franchise if plaintiff were not discharged, where (1) the defendant had a right under the franchise agreement to terminate the dealership upon a substantial change in its operation and management and (2) there were no special circumstances in the case that would impair the defendant's right of termination.

Justice HIGGINS concurs in result.

APPEAL by plaintiff from *Collier, J.,* May 18, 1970 Regular Civil Session of GUILFORD Superior Court (High Point Division), transferred from the Court of Appeals and certified for initial appellate review in the Supreme Court under G.S. 7A-31(a), docketed and argued as No. 35 at Fall Term 1970.

Plaintiff, Thurman L. Kelly, instituted this civil action against defendant, International Harvester Company (Harvester Company), to recover actual and punitive damages al-

legedly caused by defendant's wrongful and malicious interference with plaintiff's contract of employment with Earnhardt Truck Sales and Service, Inc. (Earnhardt), a franchised dealer of defendant at Salisbury, North Carolina.

Plaintiff alleged in substance that on Tuesday, October 1, 1968, he was employed by William L. Earnhardt (Mr. Earnhardt), Earnhardt's president, under an agreement whereby beginning October 8, 1968, he was to be Earnhardt's general manager and as such receive a salary of $1,000.00 per month, plus 25% of its net profits before taxes, plus plaintiff's travel and transportation costs; that he entered upon his employment under said contract on Tuesday, October 8, 1968; that Mr. Earnhardt discharged plaintiff on Monday, October 14, 1968, then paying him one week's salary plus certain expenses incurred by plaintiff's move from Florida to Salisbury, N. C.; that Mr. Earnhardt discharged plaintiff solely because defendant, through Don H. Gummerson (Gummerson), defendant's district manager, had advised Mr. Earnhardt it would not tolerate Earnhardt's employment of plaintiff and threatened to terminate Earnhardt's franchise if plaintiff were not discharged; and that the sole reason asserted by defendant for requiring Earnhardt's discharge of plaintiff was that plaintiff had too many friends in the High Point area where he had worked for many years and to whom he had sold International trucks and his employment by Earnhardt in Salisbury would adversely affect sales by the franchised dealer in High Point.

Answering, defendant admitted that Gummerson, at all times referred to in the complaint, was defendant's district manager and was acting in the course and within the scope of his employment. Except as stated, defendant denied all of plaintiff's essential allegations. After answering, defendant alleged three separately stated further answers and defenses, which include, inter alia, allegations as to what was said in conversations between Gummerson and Mr. Earnhardt concerning Earnhardt's employment of plaintiff.

The only evidence was that offered by plaintiff. Six witnesses testified. Plaintiff and Mr. Earnhardt testified as to matters referred to in the complaint. The other witnesses testified as to plaintiff's good general reputation and competence.

At the conclusion of plaintiff's evidence, defendant moved for a directed verdict in its favor. The agreed statement of case on appeal states simply that the "Court granted" defendant's motion. The "APPEAL ENTRIES" contain this statement: "Upon the sustaining of Defendant's motion for a directed verdict the Court, on motion of the Plaintiff, entered Findings of Fact and Conclusions of Law."

The judgment includes seventeen "Findings of Fact" and five "Conclusions of Law." Most of these findings relate solely to evidential facts, e.g., "4. On Friday, October 11, 1968, William L. Earnhardt called Don H. Gummerson, District Manager of Defendant for the North Carolina and South Carolina District, concerning the employment of Plaintiff by Earnhardt Truck Sales & Service, Inc." Some involve a weighing of the evidence rather than consideration thereof in the light most favorable to plaintiff, e.g., "12. In none of the above conversations did Don H. Gummerson say to Plaintiff or William L. Earnhardt that he would terminate the franchise agreement at Earnhardt Truck Sales & Service, Inc. if Plaintiff was not discharged by William L. Earnhardt."

The judgment concludes as follows: "IT IS THEREFORE, ORDERED, that plaintiff have and recover nothing of the defendant and that defendant have and recover from plaintiff its cost."

Plaintiff excepted and appealed. Although the "APPEAL ENTRIES" state that plaintiff, in apt time, excepted to designated findings of fact and conclusions of law, and excepted to the court's denial of plaintiff's motion that the judgment be set aside and that he be granted a new trial, plaintiff's only assignments of error are the following: "(1) The Trial Judge erred in sustaining defendant's motion for a directed verdict"; (2) the court erred in ordering "that plaintiff have and recover nothing of defendant and that defendant have and recover from plaintiff its cost"; and (3) the court erred in the signing and entry of the judgment.

*Schoch, Schoch & Schoch by Arch K. Schoch for plaintiff appellant.*

*Ervin, Horack & McCartha by C. Eugene McCartha for defendant appellee.*

---

Kelly v. Harvester Co.

---

BOBBITT, Chief Justice.

Plaintiff states, as the sole question presented, the following: "Was *the evidence* presented at trial, taken in the light most favorable to the plaintiff, sufficient to withstand motion for a directed verdict?" (Our italics.) In the discussion of this question, plaintiff ignores all particular findings of fact and conclusions of law made by Judge Collier and undertakes to establish that *the evidence* "presented a question for the jury."

[1] The question now presented correctly by plaintiff is the identical question which was presented to the trial court by defendant's motion for a directed verdict, namely, whether the evidence, when considered in the light most favorable to plaintiff, was sufficient for submission to the jury. In resolving this question, it was not required or appropriate that the trial court make "Findings of Fact" and state "Conclusions of Law." To pass upon the single question of law presented, namely, the sufficiency of plaintiff's evidence to withstand defendant's motion for a directed verdict, we must look to the evidence and base decision thereon without regard to the trial court's "Findings of Fact" and "Conclusions of Law."

[2] When plaintiff presented his evidence and rested, defendant's motion for a directed verdict in its favor was the procedure prescribed by Rule 50(a) of the Rules of Civil Procedure, G.S. 1A-1, for challenging the sufficiency of plaintiff's evidence for submission to the jury. The motion for a directed verdict under Rule 50(a) presents substantially the same question as that formerly presented by a motion for judgment of involuntary nonsuit under the (repealed) statute formerly codified as G.S. 1-183. See Comment by Phillips in 1970 Pocket Part at p. 21 to McIntosh North Carolina Practice and Procedure, 2d ed., § 1488.15, hereinafter cited as Phillips. The motion for judgment of involuntary nonsuit under G.S. 1-183 presented a question of law for decision by the court, namely, whether the evidence was sufficient to entitle the plaintiff to have the jury pass on it. *Lake v. Express, Inc.,* 249 N.C. 410, 106 S.E. 2d 518, and cases cited; *Barefoot v. Joyner,* 270 N.C. 388, 154 S.E. 2d 543; *Chandler v. Chemical Co.,* 270 N.C. 395, 154 S.E. 2d 502. The same question of law is now presented by a motion for a directed verdict under Rule 50(a).

**[3]** "On a motion by a defendant for a directed verdict in a jury case, the court must consider all the evidence in the light most favorable to the plaintiff and may grant the motion only if, *as a matter of law,* the evidence is insufficient to justify a verdict for the plaintiff." 5 Moore's Federal Practice, § 41.13 (4) at 1155 (2d ed. 1969). This statement is fully supported by well-considered decisions, including the following: *O'Brien v. Westinghouse Electric Corporation,* 293 F. 2d 1 (3d Cir. 1961) ; *Wolf v. Reynolds Electrical & Engineering Co.,* 304 F. 2d 646 (9th Cir. 1962) ; *Bragen v. Hudson County News Company,* 321 F. 2d 864 (3d Cir. 1963).

**[4]** Nothing in Rule 50(a) suggests that defendant's motion for a directed verdict operated as a waiver of jury trial. Indeed, Rule 50(a) expressly provides that "(a) motion for a directed verdict which is not granted is not a waiver of trial by jury *even though all parties* to the action have moved for directed verdicts." (Our italics.)

**[5]** Rule 50(a) concludes with this sentence: "The order granting a motion for a directed verdict shall be effective without any assent of the jury." The words, "without any assent of the jury," are used to dispel any apprehension that the jury is required to perform a perfunctory act in connection with the verdict in a case which is not submitted to it for determination. 5 Moore's Federal Practice, § 50.02(3), at 2331 (2d ed. 1969).

**[6]** When a motion for a directed verdict under Rule 50(a) is granted, the defendant is entitled to judgment unless the court permits a voluntary dismissal of the action under Rule 41(a) (2). Under this rule, at the instance of the plaintiff, the court *may* permit *a voluntary dismissal* upon such terms and conditions as justice requires. *Cone v. West Virginia Pulp & Paper Co.,* 330 U.S. 212, 217, 91 L. Ed. 849, 853, 67 S.Ct. 752, 755 (1947) ; Sizemore, General Scope and Philosophy of the New Rules, 5 Wake Forest Intra. L. Rev. 1, 38 (1969). Here, prior to judgment, plaintiff did not request a voluntary dismissal and, subsequent to judgment, the motion by plaintiff was that the judgment be set aside and that he be granted a new trial.

**[7]** Apparently, the "Findings of Fact" and "Conclusions of Law" made by the court at the instance of plaintiff's counsel were made under the apprehension that Rule 41(b) was or

Kelly v. Harvester Co.

might be applicable. The ground for dismissal under Rule 41(b) is that *"upon the facts* and the law the plaintiff has shown no right to relief."* (Our italics.) When applicable, Rule 41(b) requires that the court, when rendering judgment on the merits against the plaintiff, shall make findings of fact as provided in Rule 52(a). See Phillips, § 1375, p. 35; Sizemore, *op. cit.* at 35. However, Rule 41(b) has no application when considering a motion for a directed verdict in a jury trial. See Phillips, § 1488.5, p. 19; Sizemore, *op. cit.* at 36-38. By its express terms, Rule 41(b) applies only "in an action tried by the court without a jury."

In the present case, the "Findings of Fact" and "Conclusions of Law" were not required or appropriate and have no legal significance. Indeed, the briefs proceed on this assumption. Neither brief attributes significance to any finding of fact or any conclusion of law. They proceed on the assumption that the case is to be decided on the basis of *the sufficiency of the evidence* to go to the jury.

The evidence with reference to plaintiff's employment and discharge by Earnhardt, Harvester Company's franchised dealer in Salisbury, must be considered in the light of the existing relationships between Harvester Company and Earnhardt and of the Harvester Company's dealership in High Point and plaintiff's former involvement in the High Point dealership.

The evidence as to the relationship between Harvester Company and Earnhardt preceding and at the time of plaintiff's employment by Earnhardt (October 1, 1968) tends to show the following:

In meetings and discussions for several months prior to October 1, 1968, Gummerson expressed disapproval of Mr. Earn-

hardt's management of the Earnhardt dealership. According to Mr. Earnhardt's testimony, there was friction because of disagreements as to the respective liabilities of Earnhardt and Harvester Company to purchasers of International products under warranties issued in connection with sales. By letter(s) of termination dated August 19, 1968, the Harvester Company notified Earnhardt that its dealership was terminated as of February 20, 1969. Mr. Gummerson spoke of this as placing defendant *on probation.* Some two months prior to October 1, 1968, Mr. Earnhardt, with Gummerson's approval, had hired one Al Carter as general manager of Earnhardt's Harvester Company business. On October 1, 1968, Mr. Earnhardt employed plaintiff to replace Carter as such general manager. On Wednesday, October 10, 1968, George White, Zone Manager in the Harvester Company's Motor Truck Division, visited Earnhardt's place of business. On October 11, 1968, Mr. Earnhardt called Gummerson and advised him of plaintiff's employment by Earnhardt and that White had made statements indicating that the employment of plaintiff would not be acceptable to the Harvester Company. When expressing his disapproval of the hiring of plaintiff as general manager of Earnhardt's business for the Harvester Company, Gummerson told Mr. Earnhardt "that Mr. Carter was doing a good job."

The evidence as to the Harvester Company's dealership in High Point and plaintiff's former involvement in the High Point dealership tends to show the following:

Plaintiff was and is a "truck specialist." Prior to September, 1961, he had been employed as sales manager of a franchised dealer in Corbett motor trucks, Diamond motor cars, etc.

In September, 1961, Truck and Trailer Sales, the Harvester Company's franchised dealer in High Point, "lacked about $75,000.00 of having anything." For organizing a corporation, Carolina Truck and Trailer Sales, Inc. (Carolina), to take over the business and put it "on its feet," plaintiff received 25% of the corporate stock and was made "Vice President in charge of sales." Plaintiff worked for Carolina until June, 1968, when his services "were terminated . . . by mutual agreement." During the last eighteen months of his employment by Carolina, plaintiff was also working for and president of a separate corporation, Continental Truck Leasing Company (Continental),

"which was a part of Carolina Truck and Trailer Sales." During this period, the leasing company purchased from the sales company International trucks in the amount of "say $150,000.00."

During the last eighteen months of his employment by Carolina, plaintiff was having "marital difficulties" and also "a drinking problem." Too, on account of necessary surgery, he was absent from the business for approximately five weeks. Carolina's volume of business dropped from $1,600,000.00 in fiscal year 1966 to $1,300,000.00 in fiscal year 1967. In fiscal year 1968, which ended in August, 1968, the volume "had dropped to $700,000," but "that had been made up by Continental Leasing to the tune of $300,000.00 on a more profitable level than Carolina." (Note: Continental also leased trailers which it purchased from Dorsett Distributing Company.) Fiscal year 1968 ended some two months after the termination of plaintiff's employment in June, 1968. Until two months before plaintiff's employment was terminated, a Mr. Mickey had been general manager. Plaintiff had been vice president and sales manager of Carolina and also president of Continental. Through "a maneuver by (plaintiff's) partners," John Ray was made general manager although "he owned no stock." John Ray had been general manager for approximately two months when plaintiff's employment was terminated "by mutual agreement."

The evidence as to what occurred from the termination of plaintiff's employment by Carolina (June, 1968) until plaintiff's employment by Earnhardt (October 1, 1968) tends to show the following:

After the termination of his employment with Carolina, plaintiff, while visiting his brother in Panama City, Florida, met Mr. Bull Cowart and negotiated with him with reference to employment by the Cowart Motor Company. Cowart Motor Company was a dealer under "several different franchises," including a franchise from the Harvester Company. At plaintiff's request, Mr. Cowart called Mr. Gummerson and was advised by Mr. Gummerson that plaintiff was "highly qualified," had "excellent knowledge of the product," and was "a go-getter." In response to Gummerson's statement that he understood "that Tom (plaintiff) has had a drinking problem and some personal problems," Mr. Cowart stated that he knew "all about that," that plaintiff had "explained all that." Gummerson remarked:

"That is like Tom; he will tell you the truth about it." Plaintiff was offered immediate employment by the Cowart Motor Company, "to organize the International Harvester franchise end" of its business, at $300.00 per week, plus new car transportation, plus all expenses." Plaintiff advised Mr. Cowart he could not go to work that day, that he had "to get back to North Carolina," and that he would "be back to work in ten days."

Plaintiff returned to Panama City and worked under his employment by Cowart Motor Company for six or seven weeks. While so employed, plaintiff and Mr. Earnhardt met in Atlanta, Georgia, on October 1, 1968, to discuss the employment of plaintiff by Earnhardt. At this meeting, plaintiff was employed as Earnhardt's general manager of its Harvester Company business. Pursuant to their agreement, plaintiff began work for Earnhardt on October 8, 1968, at a salary of $1,000.00 per month, plus 25% of Earnhardt's net profits before income taxes, plus new car transportation and expenses.

The evidence with reference to the circumstances immediately preceding and at the time of the discharge of plaintiff by Earnhardt tends to show the following:

As a result of the telephone conversation on Friday, October 11, 1968, between Mr. Earnhardt and Gummerson, referred to above, plaintiff conferred with Gummerson in Charlotte, N. C., on Monday, October 14, 1968. In the course of their conversation, Gummerson stated that if plaintiff were employed as Earnhardt's general manager plaintiff "would indeed be gravitating toward High Point, . . . would pull the business out of there and that John Ray (was) struggling"; and that if plaintiff were to "go to High Point it would muddy the water and make things difficult on the High Point dealership." Asked by plaintiff whether he would "lift" Earnhardt's franchise if Mr. Earnhardt kept plaintiff "in his employ," Gummerson replied: "I will answer that question to Mr. Earnhardt if you will have him call me." Later that day, after plaintiff's return to Salisbury, Mr. Earnhardt called Gummerson and plaintiff obtained Mr. Earnhardt's permission to "listen in" to their conversation. During this conversation, Mr. Earnhardt informed Gummerson that plaintiff had been employed to replace Al Carter as general manager. Gummerson explained that Earnhardt's employment of plaintiff "would gravitate toward High Point and pull the

sales from there and especially in Thomasville, where (plaintiff) had a very large account; and that he would not tolerate (plaintiff) being in the dealership." When asked by Gummerson what he was going to do about it, Mr. Earnhardt replied: "You give me no alternative, I will have to discharge him." Plaintiff's employment by Earnhardt was terminated October 14, 1968, at which time Earnhardt paid plaintiff a total of $310.00, $250.00 as salary for one week and $60.00 as reimbursement for expenses.

On October 23, 1968, plaintiff saw Gummerson in Greensboro and told him he "had been fired." On that occasion, in the course of an extended conversation, Gummerson told plaintiff "that John Ray, the man that replaced (him) at Carolina Truck and Trailer Sales . . . had applied for a co-op dealership and that this dealership was pending at this time predicated on his recommendation," adding: "Now, Tom, you know that John Ray worked for me for a long time and I feel personally responsible for John Ray . . . . I can't afford to let you go over there and hurt International Harvester or John Ray, because of this cooperative dealership." The proposed cooperative dealership would have involved a purchase by the Harvester Company of a three-fourths interest in the dealership business, John Ray to retain a one-fourth interest and "be in control and manage the dealership." Gummerson indicated he had "no doubt" the cooperative dealership would be approved and did not want plaintiff "over there muddying up the water." (Note: There was no evidence such a cooperative dealership came into existence.)

As promised in the conversation of October 23, 1968, on October 25, 1968, Gummerson wrote letters on stationery of International Harvester Motor Truck, Charlotte District Office, signed by him as "District Manager," in which he recommended plaintiff for employment to each of the following franchised dealers of the Harvester Company, *viz.*: (1) Surry Truck and Tractor Company, Mount Airy, North Carolina; (2) Edens Truck Center, Florence, South Carolina; (3) Burton Truck and Equipment Company, Columbia, South Carolina; (4) Hickory International Truck Sales, Inc., Hickory, North Carolina. Although plaintiff received these four letters of recommendation from Gummerson, he testified he "could not pursue them because at this time (he) had entered into litigation against them,

and (he) knew that it would be prohibited." With the exception noted below, plaintiff's efforts to obtain employment, and the employments obtained by him, were with businesses other than franchised dealers of the Harvester Company. At an unidentified time following plaintiff's conference with Gummerson on October 23, 1968, one Earl Ogburn, "heavy-duty truck sales manager" and an assistant to Gummerson, called plaintiff "at (his) home in High Point" and as a result plaintiff went to Whiteville, North Carolina, and interviewed Mr. Marks, "the International Harvester Dealer in that area," relative to employment. However, "they did not need anybody in that particular dealership."

The basis of our decision renders unnecessary a review of the evidence which bears solely on the issue of damages.

On cross-examination, Mr. Earnhardt's attention was directed to Paragraph 26 of the (Earnhardt-Harvester Company) Franchise Dealer Agreement, which had been marked as defendant's Exhibit No. 1, specifically to a portion of Subsection A-1. After Mr. Earnhardt had read "to himself" from the exhibit, he was asked the following question:

"So, Mr. Earnhardt, isn't it true that under your franchise agreement with International, that International could at its option terminate that agreement effective at once, if the dealer is a corporation and there is any change in the principal officers, directors, management, or stock ownership which in the opinion of the Company will effect a substantial change in the operation, management or control of the dealership?" His answer was: "Yes, sir."

[8] When considered in the light most favorable to plaintiff, there was sufficient evidence to permit a jury to find that Earnhardt discharged plaintiff because of Gummerson's refusal to approve his employment as Earnhardt's general manager and the prospect of immediate termination of its franchise if plaintiff were not discharged. The crucial question is whether the evidence, when considered in the light most favorable to plaintiff, would permit a finding that Gummerson's actions were tortious rather than in the exercise of the Harvester Company's legal rights.

Plaintiff relies largely on *Childress v. Abeles*, 240 N.C. 667, 84 S.E. 2d 176 (petition for rehearing dismissed, 242 N.C. 123,

86 S.E. 2d 916), where this Court held that "an action in tort lies against an outsider who knowingly, intentionally and unjustifiably induces one party to a contract to breach it to the damage of the other party." The opinion of Justice (later Chief Justice) Parker sets forth in detail the essential elements of this cause of action, one being "that in so doing the outsider acted without justification." *Id.* at 674, 84 S.E. 2d at 181.

In *Wilson v. McClenny,* 262 N.C. 121, 132, 136 S.E. 2d 569, 578, following a discussion of Childress, Justice Sharp states: "The distinction between Childress and the case *sub judice* is that defendants here are not *outsiders*. They are all stockholders and directors of Gateway. . . . As either directors or stockholders, they were privileged purposely to cause the corporation not to renew plaintiff's contract . . . if, in securing this action, they did not employ any improper means and if they acted in good faith to protect the interests of the corporation."

The Harvester Company was not *an outsider*. Its franchise agreement with Earnhardt antedated the negotiations between Mr. Earnhardt and plaintiff and was in effect at the time of such negotiations. Its primary interest under the contract was the sale of its products in the Salisbury area through Earnhardt. To accomplish this, Gummerson had approved Al Carter as Earnhardt's general manager of its Harvester Company business. Gummerson thought Carter was doing a good job when Earnhardt employed plaintiff to replace him.

The pertinent common-law rule is set forth in Restatement of Torts, § 773, as follows: "One is privileged purposely to cause another not to perform a contract, or enter into or continue a business relation, with a third party by in good faith asserting or threatening to protect properly a legally protected interest of his own which he believes may otherwise be impaired or destroyed by the performance of the contract or transaction." See also *Raycroft v. Tayntor,* 68 Vt. 219, 35 A. 53 (1896).

Apart from the Harvester Company's legal right under the common law to protect and promote its own interests in the conduct and success of Earnhardt's business, the franchise contract provided expressly that the Harvester Company had the right, at its option, to terminate the agreement, "effective at once," in the event of any change in Earnhardt which, in the opinion of the Harvester Company, "will effect a substantial change in the operation, management or control of the dealership." Plaintiff's

brief states: "The defendant, indeed, possessed a contractual right to terminate the franchise agreement if there were a substantial change in management." Unquestionably, the employment by Earnhardt of plaintiff as the new general manager of its Harvester Company business, effected "a substantial change in the operation, management or control of the dealership." Absent *special circumstances,* neither the exercise nor the threat to exercise a legal right may be considered tortious conduct.

"Absolute rights, including primarily rights incident to the ownership of property, *rights growing out of contractual relations,* and the right to enter or refuse to enter into contractual relations, may be exercised without liability for interference without reference to one's motive as to any injury directly resulting therefrom. This is in contrast to the exercise of common and qualified rights which may be exercised only where there is justification therefor. In other words, acts performed with such an intent or purpose as to constitute legal malice and without justification, which otherwise would amount to a wrongful interference with business relations, are not tortious where committed in the exercise of an absolute right." (Our italics.) 45 Am. Jur. 2d, Interference § 23.

Plaintiff contends the general rule is not applicable because of these *special circumstances:* He asserts the evidence, when considered in the light most favorable to him, tends to show that Gummerson's refusal to "tolerate" plaintiff's employment as Earnhardt's general manager was not based upon his lack of qualifications to develop Earnhardt's business but was to protect the High Point dealership from competition by Earnhardt. In making these contentions, plaintiff stresses the testimony as to statements by Gummerson with reference to a proposal for a a "cooperative dealership" in High Point in which the Harvester Company would acquire a three-fourths interest.

Although the evidence discloses that Gummerson was satisfied with Al Carter's service as Earnhardt's general manager, there was evidence tending to show that Gummerson's primary objection to plaintiff as Earnhardt's general manager was the apprehension that he would "gravitate" from the High Point dealership to the Salisbury dealership sales to customers in the High Point area and especially customers who had bought from him while he was employed by Carolina. The evidence affords ample grounds for this apprehension. Until June, 1968, and for

ten years or more prior thereto, plaintiff had sold International products in the High Point area. His principal contacts as well as his home were in High Point.

Over a period of three years prior to the termination of plaintiff's employment at Carolina "by mutual agreement," Carolina's volume of business had decreased drastically. In October, 1968, Carolina, the High Point dealership, was referred to as "struggling." When considered in context, the evidence as to a proposed "cooperative dealership" in High Point in which the Harvester Company was to acquire a direct financial interest indicates that the High Point dealership had fallen into desperate straits to warrant consideration by the Harvester Company of such a cooperative dealership. Nothing in the record suggests that such a cooperative dealership came into existence.

If otherwise lawful, plaintiff contends Harvester Company's conduct is tortious because it was an unlawful attempt to stifle competition by a division of territory in violation of the Sherman Act. 15 U.S.C.A. § 1 *et seq.* Plaintiff cites *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 18 L. Ed. 2d 1249, 87 S. Ct. 1856 (1967), as authority for the proposition that a manufacturer which sells its products to a dealer cannot lawfully restrict the territory in which the dealer may sell these products. Conceding, *arguendo*, it is authority for the proposition stated by plaintiff, the cited case does not apply to the factual situation now under consideration.

It is first noted that the franchise agreement (other than the provision as to termination referred to in Earnhardt's testimony) is not in the record. Whether the Harvester Company sells to its dealers or consigns products for sale on commission does not appear. Nor is there evidence bearing upon the sale or resale prices of any International products. Nor does it appear that Gummerson sought to place any restrictions upon Earnhardt as to the territory in which it could make sales. In ordinary course, it would be expected that the principal market for the Salisbury dealer would be in the Salisbury area.

It is noteworthy that Gummerson undertook to assist plaintiff in finding employment with other International dealers. Gummerson recommended plaintiff for the employment plaintiff obtained in Panama City, Florida. After the termination of plaintiff's employment with Earnhardt, Gummerson gave plaintiff letters of recommendation to International dealers. Referring

to the dealers to whom Gummerson addressed these letters, plaintiff asked Gummerson: "Don, if I go to one of these other boys are you still going to do the same thing if I sell in High Point?" Gummerson replied: "Well, Tom, you know that nobody can really control that. . . . But we are not going to tolerate your muddying up the water in High Point." Under the circumstances here disclosed, no division of territory in violation of the Sherman Act is involved.

We think the evidence as to *special circumstances,* when considered in the light most favorable to plaintiff, is insufficient to impair the Harvester Company's legal right (option) to terminate (or threaten to terminate) the franchise agreement when there is "a substantial change in the operation, management or control of the dealership."

For the reasons indicated, we hold the evidence insufficient for submission to the jury and that defendant's motion for a directed verdict was properly allowed. Hence, the judgment of the court below is affirmed.

Affirmed.

Justice HIGGINS concurs in result.