HOYLE D. RYDER v. PERRY BENFIELD T/A GREEN PARK CABINET
    CENTER; EDDIE HUFFMAN T/A CAROLINA LANDSCAPING AND PAV-
    ING COMPANY; AND HOWARD LAFFON

No. 7925SC43

(Filed 16 October 1979)

1. **Negligence § 57.10— fall of wall on workman—sufficiency of evidence of
   negligence—no contributory negligence as matter of law**

   In an action to recover for personal injuries sustained by plaintiff when a
   cinder block wall in defendant's basement collapsed on him, evidence
   presented a question for the jury to decide whether defendant's failure to
   brace the wall and warn plaintiff of the danger constituted actionable
   negligence and whether such negligence was a proximate cause of plaintiff's in-
   juries and such evidence did not disclose contributory negligence as a matter
   of law where it tended to show that defendant was informed on at least two
   occasions by at least two different individuals that a retaining wall behind
   which fill dirt was to be poured should be braced; it could be inferred that
   defendant was aware that failure to brace such a wall would create a
   dangerous or unsafe condition; that defendant knew the wall had not been
   braced could reasonably be inferred since he owned the premises, planned the
   renovations to the basement and hired all the work done; and there was no in-
   dication that plaintiff was warned of the absence of bracing in the wall.

2. **Evidence § 49.1— hypothetical question—essential facts contained in question**

   In an action to recover for personal injuries sustained by plaintiff when a
   cinder block wall in defendant's basement collapsed on him, the trial court did
   not err in allowing plaintiff's expert witness to answer a hypothetical question
   regarding his opinion as to what caused the wall to fall, since the question con-
   tained every essential fact brought out at trial and plainly enabled the witness
   to form a reliable and intelligent opinion as to whether the retaining wall was
   or was not properly constructed.

3. **Torts § 7.1— settlement with one tort feasor—judgment against other tort
   feasor reduced**

   Where plaintiff settled with one tort feasor for $2000 before trial, defend-
   ant was entitled to have the judgment reduced by the amount of that settle-
   ment.

APPEAL by defendant from *Graham, Judge.* Judgment entered 30 September 1978 in Superior Court, CATAWBA County. Heard in the Court of Appeals on 20 September 1979.

In this civil action plaintiff sued defendant Perry Benfield, trading as Green Park Cabinet Center; defendant Eddie Huffman, owner and operator of Carolina Landscaping and Paving Co.; and defendant Howard Laffon, a brick mason, to recover damages for injuries he received when a cinder block wall in the basement of Benfield's shop collapsed and fell on him. Plaintiff charged that his injuries proximately resulted from the negligence of Benfield "in the manner in which [he] . . . erected or caused to be erected the cinder block wall and in negligently maintaining and supervising said wall to see if said wall was securely in place and in permitting the same to break loose and fall." Additionally, plaintiff claimed that the defendant Laffon was negligent in erecting the wall without bracing it; that the defendant Huffman was negligent in backfilling behind the wall with sand when he "knew or in the exercise of reasonable care should have known that the wall constructed by Howard Laffon was improperly constructed and erected and would not support the weight of the sand placed therein"; and that the "independent, separate and concurring negligent conduct" of these defendants was the direct and proximate result of his injuries.

In their respective answers, defendants denied the essential allegations of plaintiff's complaint and pleaded contributory negligence on his part in bar of his claim. Each crossclaimed against the other for contribution and indemnification.

Before the case was called for trial, plaintiff took a voluntary dismissal as to the defendant Huffman, for which this defendant paid plaintiff $2,000.00. The cause then came on for trial on 20 September 1978, and plaintiff introduced evidence tending to establish the following:

Plaintiff is the sole owner of a concrete finishing company, a business in which he has been engaged for approximately thirteen years. His son, Anthony, has been working with the company since April 1971, and their work involves "grading driveways, basements and patios and pouring and finishing concrete."

Ryder v. Benfield

About three weeks prior to the accident, plaintiff entered into a contract with the defendant Benfield to pour a concrete slab over the entire basement area of Benfield's cabinet shop. Plaintiff and his son performed the job, getting the dirt floor ready one day and pouring the slab the next, and then further negotiated with Benfield to come back and pour a concrete cap or shelf on top of a cinder block retaining wall which the defendant intended to have erected in the basement. The testimony of both plaintiff and his son was to the effect that plaintiff told Benfield the wall would need to be braced "and he said that he would have it braced."

On 18 September 1975 plaintiff, along with his son and two other workers, returned to the cabinet shop to pour the shelf. Upon arriving, they found that the wall had been built, but that employees of the defendant Huffman were still in the process of backfilling. The wall itself, according to plaintiff and his son, was approximately six to seven feet in height, "about three to four feet away from the dirt bank or old wall", and about four feet from the ceiling. Plaintiff's son testified that the wall had been backfilled all the way around to within a foot or a foot and a half of its top. A tractor operator from the defendant Huffman's company was "hauling sand into the basement and dumping it over behind the wall. . . . [He] lacked a little of having the wall backfilled." Plaintiff told his son "to go ahead and help the tractor operator finish so that we could get our job done", so his son stood up on the sand behind the wall and helped to level it out. Within one to two hours of plaintiff's arrival, the backfilling was finished, and plaintiff proceeded with his job. First,

> we had to put a four inch board around the top of the block wall for forming the concrete and to keep it from running over the wall. We used a regular forming board, four inches wide and three-quarters of an inch thick. We attached the boards to the block wall with [two-and-a-half-inch long] concrete nails which were driven into the joints [with a normal-sized hammer]. The boards were located at the top of the wall and extended about two inches above the wall. Their purpose was to hold the concrete and to keep it from coming out over the edge of the blocks. It took us about forty-five minutes to put up the forming boards.

At the suggestion of the defendant Benfield, plaintiff enlisted the aid of the tractor operator to haul the wet concrete in the tractor's front-end loader bucket. While plaintiff "was watching out for the tractor operator to see that he didn't hit the wall", since the operator "didn't have much room to operate in", plaintiff's son and another worker (Steve Causby) were on top of the wall, raking the concrete out of the bucket. On cross-examination, his son described the procedure as follows:

> Steve Causby had one foot on the wall and one foot on the sand and was raking concrete. I was doing the same. I would rake the concrete and then step to one side to let Steve float it down. When I stepped to one side, I stepped onto the wall. Then I would step back from the wall to let Steve pass in front of me. He walked on the dirt and sand to do that. He could possibly have had his feet placed on the wall at the same time mine were. It is possible that both of us could have been standing on the wall at the same time.

The thickness of the shelf they were pouring varied from two to four inches. According to Anthony Ryder, "[t]he concrete that we were pouring was pretty heavy . . . wet enough to run down but not wet enough to run over the wall, but it was not too dry so that it put pressure on the wall." He and Causby were about halfway through the job when the wall caved in, pinning his father underneath. Ryder initially denied that the part of the wall on which he was standing fell first; but, after being reminded of his earlier deposition testimony, he indicated that the wall " 'started falling where we were at. It went back to the corner and then the other side came down.' "

As noted above, plaintiff testified that he had mentioned to the defendant Benfield some three weeks before he undertook to pour the concrete shelf that the wall would need to be braced. He did not, however, at any time ask Benfield whether the wall actually had been braced, nor did he check the wall to determine for himself if it contained bracing. Instead, plaintiff stated that he "assumed" the wall had been braced.

> I did not make [the bracing] a precondition of coming out there to pour the cap on the wall. I did not tell him that I would not work on the wall unless it was braced. My telling

Mr. Benfield that the wall needed to be braced was only a suggestion.

On the other hand, plaintiff also said that he would not have attempted to pour the shelf had he known in advance that the wall had not been braced.

Both plaintiff and his son testified concerning various methods used to brace retaining walls. Of the four ways with which they were generally familiar, three of the methods would have been visible from the outside of the wall. Plaintiff testified that he knew the three obvious methods had not been used. Plaintiff's son testified that, when he inspected the wall prior to pouring the cap, he "could see that there were no braces on the front of the wall, but I do not know about bracing behind it . . . because of the backfilling." He stated further that, of the four methods of bracing that could have been employed, he knew when he checked the wall that neither of two methods had been used. Moreover, a third method could not have been used since the braces, of necessity, would have been put in before his father poured the concrete floor. On cross-examination, Ryder admitted that the wall itself seemed to be in good condition and that he did not notice any obvious defects. He also conceded that he could have checked to see if there was bracing in the wall that would not have been obvious, but he did not do so.

Plaintiff also offered the testimony of the defendant Laffon, called as an adverse witness, who testified in substance that he had been hired by the defendant Benfield to build the retaining wall; that he had told Benfield "to brace the wall from the outside if he was going to backfill"; that Benfield knew he, Laffon, was not bracing the wall, but didn't say anything about it; that he had been laying bricks for ten years and had never braced a wall because "[s]omebody other than the brick mason does it"; that he built the wall in accordance with Benfield's instructions; and that the wall was not of a uniform height all the way around and reached only five and a half to six feet at its highest point.

Plaintiff next called Howard Rowe, who was qualified as an "expert in the field of masonry construction and as a brick and block mason." Rowe was permitted to testify, over objection, as to his opinion that retaining walls should be braced; that the cinder block wall in the defendant's basement was not properly

constructed because it was not braced; and that the wall fell due to "pressure from that backfilling of sand, the weight of the sand, the weight of the concrete, wet concrete, and possibly that tractor moving in and out of there could have vibrated the floor so that could set it off." Rowe added, on cross-examination, that "any subcontractor should make sure for his own safety . . . [by] checking to see whether the wall is braced or not. . . ."

Following the plaintiff's medical testimony, with which he concluded his case, the court allowed the defendant Laffon's motion for a directed verdict. The following issues were submitted to and answered by the jury as indicated:

> 1. Was the plaintiff, Hoyle Ryder, injured by the negligence of the defendant, Perry Benfield?
>
> Answer: Yes.
>
> 2. Did the plaintiff, Hoyle Ryder, by his own negligence, contribute to his injury?
>
> Answer: No.
>
> 3. What amount, if any, is the plaintiff, Hoyle Ryder, entitled to recover for personal injuries?
>
> Answer: $18,000.00.

From judgment entered on the verdict, defendant appealed.

*Sigmon, Clark & Mackie, by E. Fielding Clark II and Jeffrey T. Mackie, for plaintiff appellee.*

*Helms, Mulliss & Johnston, by Robert B. Cordle and N. K. Dickerson III, for defendant appellant.*

HEDRICK, Judge.

First, defendant assigns error to the denial of his timely motions for a directed verdict and for judgment notwithstanding the verdict. Defendant argues that the evidence fails to disclose any breach of duty on his part. To the contrary, he asserts, the evidence shows contributory negligence as a matter of law "because [plaintiff] was or should have been aware of the condition which he alleged resulted in his injury."

In ruling on defendant's motions for a directed verdict and for judgment notwithstanding the verdict, the test is whether the evidence was sufficient to entitle plaintiff to have the jury consider it. *Kelly v. International Harvester Co.*, 278 N.C. 153, 179 S.E. 2d 396 (1971). To determine this question, "all evidence which supports plaintiff's claim must be taken as true and viewed in the light most favorable to him, giving him the benefit of every reasonable inference which may legitimately be drawn therefrom, and with contradictions, conflicts and inconsistencies being resolved in his favor." *Maness v. Fowler-Jones Construction Co.*, 10 N.C. App. 592, 595, 179 S.E. 2d 816, 818, *cert. denied*, 278 N.C. 522, 180 S.E. 2d 610 (1971). The issues thus framed for our resolution in this case are: Did plaintiff offer any evidence which, when considered in accordance with the above test, tends to prove that his injuries were proximately caused by the negligence of the defendant Benfield, and does the evidence establish as a matter of law that the plaintiff failed to exercise the requisite degree of ordinary care for his own safety? We are of the opinion that the evidence was such as to permit different inferences reasonably to be drawn therefrom, and, therefore, both questions were properly submitted to the jury.

The parties stipulated before trial to the fact that plaintiff was an independent contractor. When he came onto the defendant's premises to pour the concrete shelf, he was also an invitee to whom defendant owed a duty of "due care under all the circumstances." *Spivey v. Babcock & Wilcox Co.*, 264 N.C. 387, 388, 141 S.E. 2d 808, 810 (1965). Specifically, the duty owed by the defendant contractee has been described as follows:

> One going upon another's property as an independent contractor . . . is an invitee to whom the property owner is liable for an injury occasioned by an unsafe condition of the premises encountered in the work, which was known to the property owner but unknown to the injured person. Generally speaking, an employer owes a duty to an independent contractor . . . to turn over a reasonably safe place to work, or to give warning of dangers.

41 Am. Jur. 2d, *Independent Contractors* § 27 (1968). *See also Deaton v. Board of Trustees of Elon College*, 226 N.C. 433, 38 S.E. 2d 561 (1946).

[1] Viewing the evidence in the instant case in the light most favorable to the plaintiff, it appears that defendant was informed on at least two occasions by at least two different individuals that a retaining wall behind which fill dirt was to be poured should be braced. Reasonable men could draw a logical inference therefrom that the defendant was aware that failure to brace such a wall would create a dangerous or unsafe condition. Moreover, that defendant knew the wall had not been braced could also reasonably be inferred since he owned the premises, conducted his business there, planned the renovations to the basement, and hired all the work done. There is no indication in plaintiff's evidence, and defendant has not come forward with any proof, from which one could conclude that plaintiff was warned of the absence of bracing in the wall. Thus, one justifiable conclusion to make is that plaintiff reasonably "assumed" the wall had been braced, especially in light of the evidence that defendant told plaintiff he would have the wall braced. We believe this evidence presented a question for the jury to decide whether defendant's failure to brace and to warn constituted actionable negligence and, further, whether such negligence, if any, was a proximate cause of the plaintiff's injuries.

We next consider the defendant's contention that, regardless of whether he failed to exercise ordinary care, the plaintiff is barred from any recovery because plaintiff was contributorily negligent as a matter of law. Only when no other than this one conclusion reasonably can be drawn from the evidence is con- tributory negligence properly held proved as a matter of law. *Spivey v. Babcock & Wilcox Co., supra.* Although we agree that some evidence was introduced from which the jury could have concluded that the plaintiff failed to exercise ordinary care for his own safety, we are not persuaded that the evidence was sufficient to compel that conclusion as a matter of law. Thus, we hold that the court did not err in refusing to grant the defendant's motions for directed verdict and judgment notwithstanding the verdict.

By assignments of error numbers 4, 5 and 6, based on numerous exceptions noted in the record, defendant contends that the court erred in allowing plaintiff's expert witness, Rowe, to answer certain hypothetical questions regarding his opinion as to what caused the wall to fall. Defendant first argues that the ques- tion itself was "seriously deficient" for the reason that it did

not contain all the essential facts. The hypothetical question complained of in essence sought the witness' opinion of whether the wall was "properly constructed" if the jury should find by the greater weight of the evidence that a wall made of eight-inch cinder blocks and approximately six to seven feet high was constructed in the defendant's basement; that the wall was backfilled, but not braced; that the backfilled space between the old dirt wall and the new concrete wall was two to four feet wide, and the space between the top of the wall and the first floor joist was about four feet; that the wall was not tied to the floor; and that the wall fell while a concrete cap was being poured on its top. Over objections and motions to strike, the witness testified that, in his opinion, the wall was not properly constructed because it lacked bracing of any kind.

The rule with respect to the form of hypothetical questions is that the question must contain all the material facts necessary to enable the expert to express an intelligent and reliable opinion. "Although it is not necessary to incorporate *all* of the facts, the trial judge may properly exclude the witness's answer if the question presents a picture so incomplete that an opinion based upon it would obviously be unreliable." 1 Stansbury's N.C. Evidence, *Opinion* § 137 (Brandis rev. 1973). [Emphasis in original.] Moreover, the question should not include extraneous facts, nor should it assume those facts sought to be established. And where the evidence is conflicting as to any essential fact, the assumption of one version over another is not prejudicial. 6 Strong's N.C. Index 3d, *Evidence* §§ 49.1, 49.2 (1977).

[2] In this case the witness Rowe was qualified as an expert "in the field of masonry construction and as a brick and block mason." Judging from the evidence in the record, we are satisfied that the question contained every essential fact brought out at trial and plainly enabled this witness, who was an expert in the field, to form a safe, reliable and intelligent opinion as to whether the retaining wall in this case was or was not properly constructed. We note, furthermore, that much of which defendant now complains was rendered inconsequential, if not moot, by counsel's rephrasing of the question to take care of defendant's objections, and that many of defendant's suggestions on appeal concerning "facts" which should have been included in the question would have produced error had they been so incorporated,

since there was no evidence regarding, for instance, the type of mortar used or the make-up of the sand. *See* Stansbury, *supra.* We hold, therefore, that the question was sufficiently composed, and no error flowed from its admission.

Second, defendant charges that this expert witness "was not qualified to testify about causation." It suffices to say that the qualification of experts is a matter "ordinarily within the exclusive province of the trial judge", Stansbury, *supra* at § 133, and that, once the court decides the witness is an expert, he is properly allowed to give his opinion as to causation. Indeed, provided the question is correctly formed—which is not and could not be disputed here—the expert's foremost function is to enlighten the jury as to the appropriate inferences to be drawn from what happened, including what probably caused the incident to happen. We find this assignment of error wholly meritless.

[3] Finally, defendant contends that he was entitled to a credit against the judgment in the amount of $2,000, the sum paid by the "joint-tort-feasor" Huffman. We agree. Where one tort-feasor has settled with the injured party, the other tort-feasor, who has gone to trial, is entitled to have the judgment reduced by the amount of the settlement. *Wheeler v. Denton*, 9 N.C. App. 167, 175 S.E. 2d 769 (1970).

We do not find it necessary to discuss the question of whether the trial judge had jurisdiction to amend the judgment once notice of appeal had been given. While the record indicates that the trial judge was aware at one time of the fact that plaintiff had taken a voluntary dismissal as to the defendant Huffman upon the payment of $2,000, it does not appear that this fact was called to his attention when he signed the judgment for the full $18,000.00. Regardless, the law is clear that

> [w]hen a release or a covenant not to sue . . . is given in good faith to one of two or more persons liable in tort for the same injury . . .: (1) . . . it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it. . . .

G.S. § 1B-4. We think the ends of justice require that the amendment be made at this time. For that reason, this cause is remand-

ed to the superior court so that court may amend the judgment to reflect the fact that $2,000.00 has been paid.

The result is: In the trial we find no error. The cause is remanded to the suprior court for the entry of a judgment in accordance with this opinion.

No error. Cause remanded.

Judges CLARK and MARTIN (Harry C.) concur.