DANJEE, INC. v. ADDRESSOGRAPH MULTIGRAPH CORPORATION

No. 797SC196

(Filed 5 February 1980)

1. **Uniform Commercial Code § 8— statute of frauds—waiver by failure to plead —sufficiency of writings**

    In an action to recover for breach of contract in the sale of typesetting equipment, the trial court did not err in failing to instruct the jury on the statute of frauds of G.S. 25-2-201(1) where defendant waived the defense of the statute of frauds by failing to plead it and where the exhibits at trial constituted "writings" showing that contracts of sale had been made between the parties.

2. **Uniform Commercial Code §§ 20, 23— acceptance—revocation of acceptance—instructions not required**

    In an action to recover for breach of contract in the sale of two typesetting machines, the trial court did not err in failing to instruct the jury on acceptance and revocation of acceptance where the record shows that plaintiff retained both machines, had possession of them at the time of trial, the condition of the machines was fully known to plaintiff, and revocation of its acceptance was not available to plaintiff after the long period of time it used the machines.

Danjee, Inc. v. Addressograph Multigraph Corp.

**3. Contracts § 27.3— breach of contract of sale of machine—loss of profits**

Plaintiff's evidence was sufficient to support a jury verdict finding that defendant breached its contract of sale of a typesetting machine and awarding plaintiff $40,000 for such breach of contract where it tended to show that the machine was ordered on 19 February 1973 and defendant promised delivery in eight weeks and to provide plaintiff a loaner machine within twenty-four hours if the machine was not delivered in eight weeks; plaintiff's agent advised defendant's agent that plaintiff was going to sell business based on the arrival of the machine in eight weeks; in April 1973 plaintiff advised defendant the machine was needed desperately and asked for a loaner; a loaner was delivered about 14 May and the new machine was delivered on 22 August; a customer had committed itself to furnish plaintiff with $100,000 in business but plaintiff was unable to perform the work because it had not received the machine from defendant; and plaintiff's production costs for the work would have been from forty to sixty percent.

**4. Contracts § 27.3— breach of contract of sale of machine—damages**

Plaintiff's evidence was sufficient to support a jury verdict awarding plaintiff $11,200 for defendant's breach of contract of sale of a phototypesetter where it tended to show that defendant delivered a demonstrator model to plaintiff but represented it to be a new model; the demonstrator was worth $12,000 to $13,000 less than the $23,400 plaintiff paid for it; and the cost to reproduce work because the phototypesetter would not work properly when delivered was $7,045.34.

**5. Contracts § 29.5— interest on award for breach of contract**

The trial court erred in awarding interest on the amount awarded for breach of contract from the date of the breach.

APPEAL by defendant from *Fountain, Judge.* Judgment entered 9 October 1978 in Superior Court, WILSON County. Heard in the Court of Appeals 23 October 1979.

Plaintiff filed its complaint against defendant, alleging, *inter alia,* unfair and deceptive trade practices, breach of warranties on the sale of a 748 Phototypesetter (hereinafter referred to as 748), including a warranty that the 748 was new, breach of contract to deliver a 797 Input Machine (hereinafter referred to as 797) to plaintiff on a timely basis, and breach of warranty to provide expert care and maintenance service on plaintiff's 745 Processor.

Defendant answered, denying the material allegations of plaintiff's complaint, and alleged that plaintiff is indebted to defendant for $3,707.11 with interest from 11 March 1975, that prior to the institution of the present action, defendant had filed suit against plaintiff in District Court in Wilson County, and that

its action should be a compulsory counterclaim in defendant's action against plaintiff in District Court.

The court entered certain orders denying relief sought by defendant in its answer. Defendant's motion was granted to consolidate this case for trial and the case wherein Addressograph, as plaintiff, sought the amount due on its account with Danjee.

At trial, plaintiff presented Jean Glover, a part owner of Danjee, who testified that she and Dana Corum formed Danjee typesetting business in early 1973. On 19 February 1973, Glover telephoned Robert Jackson of Addressograph, who committed to deliver a 797 Input Machine to plaintiff within eight weeks and committed to get plaintiff a loaner machine within twenty-four hours if the 797 was not delivered in eight weeks. When plaintiff placed its 797 order, it had no funds to buy the machine, so it set up a line of credit with First Union National Bank. Plaintiff received an acknowledgment from defendant dated 7 March 1973 that the order which was C.O.D. was accepted with a delivery date on or before twelve weeks or approximately 7 June 1973. Glover immediately called Jackson, who said it should be delivered any day. The machine was not delivered in eight weeks. In April, Glover told Jackson she had sold an account, needed the machine desperately, and wanted the loaner promised. The loaner was provided with no charge to plaintiff about 14 May 1973. The 797 ordered was not installed until at least twenty-two weeks after it was ordered, about 20 August 1973.

Plaintiff paid for the machine the day it arrived. Glover was informed that the first 797 sent to fill the order was damaged at the branch office. Plaintiff could not work on the account it had with Practicing Law Institute (P.L.I.) under which plaintiff had a commitment of approximately $100,000 a year in work. Plaintiff lost this account. At that time, plaintiff's overhead expenses were a very bare minimum. Costs of production on the P.L.I. contract were calculated at forty percent to sixty percent. Plaintiff complained of jamming problems with its 797, which a serviceman ultimately remedied.

Plaintiff also ordered a 748 Phototypesetter on 29 June 1973 from defendant with a promised six to eight week delivery date. The bill on the 748 was over $23,400. A written acknowledgment, dated 16 July 1973, was received by plaintiff indicating a twelve

week delivery date on the 748. The 748 was sold C.O.D. with bank financing. Plaintiff did not personally have the money to pay for it when it was installed, and plaintiff was having difficulties with bank financing. The 748 was not delivered as promised, and plaintiff contacted defendant and told it how badly plaintiff needed the machine. Plaintiff was told it had not come from the factory. After receiving the 748 on 20 October 1973, plaintiff had a number of problems with it. A leading problem concerning the spacing of print was not finally corrected until 5 December 1973. Plaintiff was told by Jackson that the 748 was a new machine, but plaintiff learned in June 1975 that the machine had been "carted around a couple of states as a demonstrator." During the last half of 1973, plaintiff's business was operated eighteen to twenty hours per day. Defendant loaned to plaintiff and serviced free of charge a 744 machine from the end of August or first of September 1973 until the 748 was workable in February 1974. All of plaintiff's phototypesetting work after February was processed on the 748. After a meeting, the plaintiff agreed to pay $1,000 per month rent from May to July which would apply to the purchase price with the balance to be paid in full on 15 August 1974.

Raymond Harrow, who was experienced in dealing with a large number of phototypesetting companies, testified that while in charge of production with the P.L.I., he committed by verbal contract that P.L.I. would "most likely" supply plaintiff with an excess of $100,000 of business beginning in April 1973 if their requirements were met. When plaintiff could not meet the commitment, Harrow went elsewhere with the business. Harrow stated, "I cannot say that I know anyone in the business that is better than Danjee."

On recall, Glover testified that the 744 was considered a machine to use until the 748 was working and that work prepared for processing on the 744 could not be run through the 748 and vice versa. Plaintiff was told by defendant's serviceman to prepare work for the 748, but the 748 was not operable, so plaintiff had to "redo" tapes for the 744.

Ernest Bell, formerly employed as defendant's sales representative, testified that Jackson was defendant's district manager and his immediate supervisor; that on the sale of the 748, Jackson called the home office to verify the six to eight week

delivery date; that upon receipt of Plaintiff's Exhibit 5, indicating twelve weeks' delivery, Glover called Bell, and he told her it was a standard form sent to most anyone ordering equipment; that the 748 plaintiff ordered was actually received by the Charlotte office approximately six weeks after the order was turned in; that in 1973, normal procedure when a machine was received was to deliver it in two or three days; that Jackson sent the machine into North Carolina and South Carolina for sales demonstrations; that Jackson instructed Bell to tell plaintiff the machine had not come in yet, which he did; that when it was delivered, plaintiff was told it was a new machine, when in fact it was worth only about $12,000 to $13,000 instead of full value. Bell also testified that the first 797 ordered was damaged by the airfreight lines.

Plaintiff's evidence tended to show that the total cost of re-doing tapes was $7,045.34. On cross-examination, Corum testified that plaintiff operated at a loss in 1973, 1974, and 1975, and she was not positive about 1976.

A motion for directed verdict was allowed as to plaintiff's claim for punitive damages.

Defendant's evidence tended to show that Charles LaFollette, defendant's technical specialist, made a number of service visits to plaintiff's business and corrected problems with its machines. On 22 August 1973, he assisted in uncrating and testing the 748 in Charlotte. It was not in proper condition for delivery. Robert Jackson testified about placing Glover's orders from defendant, the financing involved, and the loaner machines. He committed to a normal twelve-week delivery on the 797, but testified that he had qualified it by stating he would provide a loaner if for any reason the delivery was impossible. The 797 was shipped in June by airfreight and damaged beyond repair. Plaintiff's 31 July 1973 cashier's check totally closed out the sale of the 797 on the date the replacement was delivered. The 748 was the first to come into the area, and it was shown to prospective customers in North and South Carolina prior to delivery to plaintiff. It was standard practice in the industry to show equipment while it was being operated and run to exercise it and burn in the electronics.

Concerning the agreement on the 748 machine, Jackson said he considered the payment of $1,000 per month to be rental. That "was just a very nebulous term used to apply, because at that

Danjee, Inc. v. Addressograph Multigraph Corp.

point, they had paid no money on the machine." The ninety-day period was given plaintiff to see if the 748 would function properly. In February 1973, Glover told Jackson she was going to sell business based on the delivery date of the 797. Defendant's salesman had no authority to commit defendant to shorter delivery dates than appeared in the acknowledgment of orders unless they had the equipment in their inventories, and they did not have a 748 or 797 in inventory.

Ralph Keith, defendant's repairman, testified that in October 1973, he told plaintiff to prepare tapes for the 748, but plaintiff had to reprocess them for the 744, because the 748 would not run.

At the close of all the evidence, the court denied all of defendant's motions for directed verdict except as to plaintiff's claim for unfair and deceptive trade practices, which the court allowed. Issues were submitted to the jury and were answered in favor of plaintiff. Defendant's motions for judgment notwithstanding the verdict and for a new trial were denied. Defendant appealed.

*Narron, Holdford, Babb, Harrison & Rhodes, by William H. Holdford, for plaintiff appellee.*

*Connor, Lee, Connor, Reece & Bunn, by Cyrus F. Lee and James F. Rogerson, for defendant appellant.*

ERWIN, Judge.

Defendant's first argument is based on six assignments of error and forty exceptions set out in the record on appeal. Some of the exceptions relate to the court's rulings on the admission of evidence as presented by plaintiff; four relate to motions of defendant made at the close of plaintiff's case, which were denied by the court; three relate to motions of defendant made at the close of defendant's case and denied by the court; several relate to the charge of the court to the jury; and two relate to post-trial motions for judgment notwithstanding the verdict and for a new trial, which were denied by the court.

After setting out the assignments of error and exceptions, defendant does not show the relationship of these matters to the question it requests us to determine. We conclude, from a study of the record and defendant's brief, that the first question before

us is: Did the trial court commit error in failing to instruct the jury as required by G.S. 1A-1, Rule 51, of the Rules of Civil Procedure, in that the trial court did not instruct on the Statute of Frauds, acceptance, and rejection of the goods (the 797 and 748) under the provisions of the Uniform Commercial Code? We answer, "No," for the reasons that follow.

### Statute of Frauds

[1] Defendant did not plead any affirmative defenses as required by G.S. 1A-1, Rule 8(c), of the Rules of Civil Procedure, which includes the Statute of Frauds. We hold that defendant waived any and all benefits it may have had pursuant to G.S. 25-2-201(1). In addition, the evidence presented at trial showed complete contracts for the sales. Plaintiff's Exhibits 3, 5, 6, and 10 (relating to 748) and defendant's Exhibit 10 (relating to 797) were sufficient to constitute "writings" to indicate that contracts of sales had been made between the parties. *Hosiery Mills v. Burlington Industries*, 285 N.C. 344, 204 S.E. 2d 834 (1974). We find no merit in defendant's contention that G.S. 25-2-201(1) applies in this case.

### Acceptance and Revocation of Acceptance

[2] Defendant states in its brief:

> "Again like the purchase of the 797 machine, the Plaintiff has accepted the 748 and after using it for three months or more, paid for it in full and without any NOTICE of breach as required by the provisions of GS 25-2-607(3)(a). Again the Plaintiff has neither plead nor proven the giving of any such notice."

We find no error in the trial court's failure to charge on the issue of acceptance and revocation of acceptance.

G.S. 25-2-606(1) provides:

> "§ 25-2-606. *What constitutes acceptance of goods.* — (1) Acceptance of goods occurs when the buyer
>
> (a) After a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or

(b) fails to make an effective rejection (subsection (1) of § 25-2-602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him."

The record clearly shows that plaintiff retained both machines, had possession of them at the time of trial, and had ample time to reject them, particularly since the condition of the goods was fully known to plaintiff. The acts of plaintiff were inconsistent with the seller's (defendant's) ownership. This constituted acceptance. G.S. 25-2-606(1)(c).

Revocation of acceptance was not available to plaintiff after the long period of time it used the machines. The 748 was delivered to plaintiff about 20 October 1973, and the 797 was delivered to plaintiff about 20 August 1973. Under G.S. 25-2-608(2), "[r]evocation of acceptance must occur within a reasonable time after the buyer [plaintiff] discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects." Plaintiff notified defendant of the defects, and defendant responded to plaintiff's complaints on several occasions. Plaintiff has properly instituted this action for breach of contracts after acceptance of the machines. G.S. 25-2-607(3); *Credit Co. v. Concrete Co.*, 31 N.C. App. 450, 229 S.E. 2d 814 (1976). Neither the pleadings nor the evidence raised any issue as to acceptance or revocation of acceptance. This contention of defendant is without merit.

## Breach of Contract

[3] Defendant assigns the following as error: (1) that the record in this case will not support a jury verdict that defendant breached its contract of sale of the 797; and (2) that plaintiff has made no showing to justify the jury award of $40,000 damages for breach of contract of sale of the 797. We do not agree.

Plaintiff's action is for consequential damages due to the loss of an account because of delay in delivery and making the 797 operable. Plaintiff's evidence tended to show that the 797 was ordered on 19 February 1973 and that defendant promised

delivery in eight weeks and committed to provide plaintiff a loaner machine within twenty-four hours if the 797 was not delivered in eight weeks. In April 1973, plaintiff advised defendant that the machine was needed desperately, and it wanted the loaner machine. The loaner was delivered about 14 May 1973, and the 797 was delivered about 20 August 1973, at least twenty-two weeks after it was ordered.

Defendant's evidence tended to show that it committed to a normal twelve-week delivery on the 797 but had qualified it by stating that it would provide a loaner if for any reason delivery was impossible. The 797 was shipped in June 1973 by airfreight and was damaged beyond repair.

Taking the evidence and the inferences to be drawn therefrom in the light most favorable to plaintiff, it was clearly sufficient to submit an issue on breach of contract, on the part of defendant relating to the 797, to the jury and support a verdict thereon. *Kelly v. Harvester Co.*, 278 N.C. 153, 179 S.E. 2d 396 (1971); *Adams v. Curtis*, 11 N.C. App. 696, 182 S.E. 2d 223 (1971).

Defendant's witness, Robert Jackson, testified with reference to the loaner machine:

"As to my efforts to get the loaner that I promised her for her after the order, when the order was placed was in my possession in the Charlotte office and it was based on that fact that I made the commitment to back them up so to speak if for any reason we had a delivery problem. I was not able to make the delivery of the loaner that I had there in Charlotte at that time.

Around the middle of April, my regional manager instructed me to send it to Phoenix, Arizona. I brought my problem to his attention that I was going to possibly be needing the loaner. And, he indicated that he would make sure that I had a piece of equipment there in a prompt fashion. I was able to locate and procure a loaner for her. We found a machine in the Boston district office and this was subsequently sent to Raleigh, no pardon me, I take that back, it was sent to Charlotte for installation and we transported it in a very prompt fashion to Danjee at that point. The 797 loaner was installed in her place of business the first part of May, 1973.

As to a more exact date, I think Jean, Miss Glover, commented on around the 14th of May, and I have nothing to indicate that it was before that date. I have nothing to refute that at all."

The 797 was delivered late, and problems developed in making the machine operable gave rise to an action for consequential damages. G.S. 25-2-715(2)(a). Plaintiff's evidence tended to show that it had a contract for services to be rendered in the amount of $100,000 less cost of production of $30,000 to $60,000. Plaintiff alleged its damages to be $60,000, and the jury found an amount of $40,000. The evidence was that plaintiff had a commitment based on a dollar volume that it would be supplied with business in excess of $100,000 from the P.L.I. and that plaintiff met the specifications of the institute for its business. The work was to begin in April 1973, and plaintiff was not able to keep its commitment. The business was completed by someone else.

The trial court instructed the jury as follows (defendant excepting to the first paragraph):

"(The plaintiff contends it lost $100,000.00 gross and a minimum of $40,000.00 net. So, it contends that you should answer that issue in not less, a sum not less than $40,000.00.)

Defendant excepts to this portion of the charge.

EXCEPTION NO. 93

The defendant on the other hand contends that there was no binding contract with the Practicing Law Institute and that even if it was within a very short while they got substantially the same work from another company represented by the same person who they were dealing with with the Practicing Law Institute.

And, so the defendant contends, members of the jury, that there has been no breach, but if there was, that plaintiff should recover only nominal or trivial damages, nominal damages whenever there is a breach of contract, the party who breaches it, even though he causes no actual damages, is liable for at least nominal damages. Nominal damages may be said to be a dollar, two or three dollars or five dollars. Simply something to compensate for a breach where no actual damages arise."

---

---

Defendant contends in its brief: "The Plaintiff not only had to establish the FACT of damages with reasonable certainty but had the burden of establishing the amount with reasonable certainty. If the Plaintiff fails in either regard, the Plaintiff is not entitled to recover. We submit here Plaintiff has failed in both regards."

Defendant relies on our Supreme Court's decision in *Machine Co. v. Tobacco Co.*, 141 N.C. 284, 53 S.E. 885 (1906), wherein the Court held that in an action for damages by reason of defendant's failure to exhibit plaintiff's cigarette machine at the Saint Louis Exposition, as it had contracted to do, the court erred in charging the jury that they might allow plaintiff damages suffered by the loss of profits it would have made if the contract had been performed and the loss of the benefits that would have accrued to it in increased sales of its machine, etc., in the absence of evidence that plaintiff had secured any contracts for the purchase of its machines if these proved satisfactory when exhibited, or that plaintiff would have made any particular number of sales, or any other proof which would enable the jury by any certain and reliable standard to estimate the losses.

The case *sub judice* does not fall within the rule of *Machine Co. v. Tobacco Co.*, *supra*. The evidence of plaintiff is reasonably clear that P.L.I. had committed itself to plaintiff to furnish it business. Plaintiff's evidence tended to show its overhead expenses were at a bare minimum, and if it had been able to complete the business of $100,000 as committed, its production costs could vary from forty to sixty percent. Plaintiff's agent advised defendant's agent that she was going to go out immediately and sell business based on the arrival of the 797 in eight weeks as promised by defendant. If not delivered, a loaner machine would be provided in twenty-four hours by defendant. Based on the contract, plaintiff's agents (1) began to solicit business, (2) terminated their jobs, (3) broke their lease for an apartment, (4) made arrangements to leave New York and move to Bailey, and (5) received a commitment from P.L.I.

The court's instructions were clear and correct on the issues of damages raised by the pleading and evidence properly admitted. The damages in question were ascertained and measured with reasonable certainty. *Pike v. Trust Co.*, 274 N.C. 1, 161 S.E. 2d 453 (1968). We find no merit in this assignment of error.

Defendant contends that the parties met on 14 May 1974 and entered into a new contract, wherein plaintiff agreed to make rental payments on 15 May, 15 June, and 15 July of $1,000 each and that by 15 August 1974, the balance due on the purchase price of the 748 would be paid in full. This agreement amounted to a modification of the original contract. The provisions of G.S. 25-2-209 were complied with; therefore, there was not a breach of contract. In addition, there is not any evidence showing damages. Again, we do not agree.

[4] Plaintiff's action in regard to the 748 arose out of delivery and payment for a new 748 when a demonstrator model was delivered but misrepresented as a new model and breakdowns of the 748 resulting in a costly switch to another machine. The damages are both direct and consequential. Defendant did not plead any matter that would constitute avoidance or any affirmative defense sufficiently particular to give the court and plaintiff notice of the transaction it intended to prove. G.S. 1A-1, Rule 8(c), of the Rules of Civil Procedure. Defendant did not present any written request for instructions to the jury nor did defendant object to any issue submitted. If so, the record does not show that the trial court ruled on such objections. This assignment is without merit.

Plaintiff's evidence tended to show that the actual value of the 748 when delivered in its condition to be $12,000 to $13,000 less than the $23,400 paid for it and that the cost to reproduce work because the 748 operated improperly was $7,045.34. The jury found breach of contract and awarded damages to plaintiff in the amount of $11,200. There is not any dispute that the 748 was used as a demonstrator in North and South Carolina. We hold that the evidence was amply sufficient to support the verdict of the jury. We find no error.

### Judgment

[5] The judgment entered provided interest on the sum of $11,200 from 20 October 1973 and on the sum of $40,000 from 19 May 1973. Defendant contends that the entries of interest constitute error. Plaintiff concedes that the case may be remanded to the trial court to be modified to eliminate the entries of interest on the amounts in question. We agree, in that this case does not

fall in the rule stated in *General Metals v. Manufacturing Co.*, 259 N.C. 709, 131 S.E. 2d 360 (1963).

## Conclusions

We have reviewed defendant's assignments of error and its exceptions as they relate to admission of evidence, motions made during trial, the charge of the court, and post-trial motions and find no error.

The results reached by the trial court are proper on the record before us. Although the parties did not plead any section of the Uniform Commercial Code nor did the trial court mention the code in its charge, the results would be the same as reached on this record.

In the trial of this action, we find no error. The case is remanded to modify the judgment entered in keeping with this opinion.

Judges VAUGHN and HILL concur.