HUNTER, JR., Robert N., Judge.
 

 *178
 
 Burke County Board of Education ("Defendant") appeals following jury verdicts finding Defendant liable for negligent infliction of emotional distress and invasion of privacy. On appeal, Defendant argues the trial court committed the following errors: (1) denying its motion to dismiss based on sovereign immunity; (2) denying its motion to dismiss for failure to state a claim, motion for directed verdict, and motion for judgment notwithstanding the verdict; (3) denying its motion for new trial; and (4) awarding Plaintiffs costs and expenses. We affirm.
 

 I. Factual and Procedural Background
 

 On 29 July 2014, Lewis Scott Carlton and Thomas P. Wood ("Plaintiffs") filed a complaint for invasion of privacy, breach of contract, negligent infliction of emotional distress, and civil conspiracy.
 
 [1]
 
 Plaintiffs asserted Defendant waived its right to assert sovereign immunity by purchasing liability insurance coverage. The complaint alleged the following narrative.
 

 On 28 March 2011, Wood attended a "closed" session of a Burke County Board of Education ("Board") meeting. Speaking on behalf of himself and Carlton, Wood addressed the Board "about a highly confidential matter." The Board asked him to submit the information in a
 
 *179
 
 written statement. Through its chairperson,
 
 [2]
 
 Defendant "represented ... it would maintain the confidentiality" of the information.
 
 *149
 
 On 11 April 2011, Plaintiffs "confidentially" sent envelopes to every member of the Board. In each envelope, Plaintiffs included a letter and "supporting documentation." All papers were placed "under seal[,]" with "
 
 Confidential
 
 " written on the envelope. (Emphasis in original). In the letter, Plaintiffs "raised serious concerns" about the superintendent of the Board, Dr. Arthur Stellar. Specifically, Plaintiffs alleged Stellar engaged in an "improper relationship" with Amy Morgan, a Board employee. Had Defendant not assured Plaintiffs of confidentiality, Plaintiffs "would never have submitted said materials[.]"
 

 A member of the Board gave a copy of the letter and supporting documents to Stellar. In August 2011, Stellar gave a copy to Morgan. On 11 August 2011, the Board voted to "buy out" Stellar's contract, and Morgan resigned from her position in the school system.
 

 On 31 October 2011, Morgan sued Plaintiffs for libel. As a result of the lawsuit, Plaintiffs "were viciously and maliciously attacked in the media and on the internet." Plaintiffs feared for their safety, suffered damage to their reputations and businesses, suffered severe mental and emotional distress, and spent "large sums" of money defending themselves in the Morgan lawsuit. On 1 April 2013, a court dismissed Morgan's lawsuit.
 

 On 14 October 2014, Defendant filed a motion to dismiss, pursuant to Rule 12(b)(1)-(2), (4)-(6) of the Rules of Civil Procedure. After a hearing on 20 January 2015, the court entered an order on 10 February 2015 on Defendant's motion to dismiss pursuant to Rule 12(b)(6). The court dismissed Plaintiffs' breach of contract claim. The court denied Defendant's motion on the invasion of privacy, negligent infliction of emotional distress, and civil conspiracy claims.
 

 On 16 March 2015, Defendant filed its answer. Defendant raised the defenses of contributory negligence, sovereign immunity, and expiration of the statute of limitations.
 

 On 20 May 2016, Defendant filed a notice of hearing for 31 May 2016 on its motion to dismiss pursuant to Rule (12)(b)(1)-(2). That same day, Defendant filed an affidavit by Keith Lawson, its finance officer. Lawson asserted Defendant did not waive the defense of sovereign immunity as to the invasion of privacy claim by purchasing liability insurance.
 

 *180
 
 Lawson highlighted specific portions of Defendant's insurance policy, which covered only bodily injury and property damage caused by an accident. The policy, as explained by Lawson, did not cover "Personal and advertising injury[,]" including "Knowing Violation Of Rights of Another" or any injury arising from "Oral or written publication, in any manner, of material that violates a person's right to privacy[.]" Defendant attached its insurance policy as an exhibit to the affidavit.
 

 On 31 May 2016, the court held a hearing on Defendant's motion to dismiss. Plaintiffs objected to the court's consideration of Lawson's affidavit and accompanying attachments.
 
 [3]
 
 Plaintiffs asserted Defendant violated Rule 26(c) of the Rules of Civil Procedure because Defendant did not list Lawson as a person with knowledge of the matter in its answer to Plaintiffs' request for interrogatories. Defendant argued it only waived sovereign immunity to the extent its insurance covered the claims. Defendant further asserted its insurance policies did not cover intentional torts.
 

 In an order entered 6 June 2016, the court sustained Plaintiffs' objection to consideration of Lawson's affidavit and accompanying attachments. The court also concluded: (1) Defendant should have disclosed the identity of Lawson and the insurance policy earlier in discovery; (2) the "unseasonable" disclosure prejudiced Plaintiffs; (3) the late disclosure deprived Plaintiffs of the opportunity to depose Lawson; and (4) Defendant violated Rules 26, 33, and 34 of the Rules of Civil Procedure. Accordingly, the court denied Defendant's motion to dismiss pursuant to Rule (12)(b)(1)-(2).
 

 The court called the case for trial on 20 September 2016.
 
 [4]
 
 Plaintiff Wood testified on
 
 *150
 
 his own behalf. Wood lived in Burke County and owned a photography business. Wood had two school-aged children and was "[v]ery active" in their education. At a Board meeting in January 2011, Wood heard rumors about Stellar closing the schools in Burke County. One of the county principals, Ross Rumbaugh, suggested someone else "speak ... for the school." The parents at the meeting asked Wood to act as a spokesman and talk with Stellar. After coordinating with other parents and the parent teacher organization, Wood, other parents, Rumbaugh, and Stellar met. Stellar "in a whirlwind[,]" told others he would have to close the schools because of a "huge" budget deficit.
 
 *181
 
 On 28 March 2011, the Board held a meeting to vote on closing the schools in Burke County. Twelve to fifteen hundred people attended. Wood presented, began to comment about a county employee (Morgan), and read a letter from a school employee, in which the school employee called Stellar a "bully." The Board chairperson, Catherine Thomas, "cut [him] off[.]" Thomas told Wood any personnel issues must be discussed in a closed session.
 

 At the end of the open session, the Board went into closed session. Wood told the Board he presented on behalf of himself and Carlton. Wood wanted to bring forward "sensitive issues" and "needed to know that they could be kept confidential." Thomas responded, "[T]hat's fine[,]" and the other Board members remained silent. Wood started his statement about "the manager of strategic alliance position[,]" but the Board cut him off.
 
 [5]
 

 After the closed session ended, Wood and Thomas spoke. Wood told Thomas both he and Carlton had more information about Stellar and Morgan and asked if he needed to attend another closed Board session. Thomas instructed Wood to "submit it to the board confidentially in writing ... so that they can take a look at it."
 

 The next day, Plaintiffs met and started drafting a letter. On 11 April 2011, prior to another Board meeting, Plaintiffs again met and assembled envelopes for each Board member and the Board attorney, Chris Campbell. On the outside of each envelope, Carlton wrote "Confidential." The envelope included a letter, which stated:
 

 Please find attached documentation of several issues we wish to bring before the Burke County School Board detailing disturbing allegations regarding Dr[.] Arthur Stellar and others within our school system. As concerned business owners, parents and stakeholders in Burke County we wish to respectfully request further investigation into these issues to ensure the optimal operation of our schools and more importantly the welfare of our children and this county.
 

 We are not lawyers or educators. Although we cannot personally attest to the veracity of the claims herein and make no representation any or all of the claims are factual or presented in their entirety, we do ask for a complete
 
 *182
 
 and thorough investigation. We trust you to ascertain the facts as our elected officials[.]
 

 We chose to represent these items for individuals within the school system and our county who say they are simply too afraid to speak on their own behalf. These people need their jobs, especially in such tough economic times. However they do not need to perform their jobs under such stressful and hostile conditions. For this reason please consider the source of all items herein to be anonymous or strictly confidential.
 

 We wish to apologize for the obvious lack of complete supporting documentation in some of the areas we present. This is intentional because we fear destruction of pertinent evidence if requested through normal channels. We have already been informed of such incidents with key documents related to the claims herein.
 

 We will gladly cooperate with the board in any way possible that does not endanger jobs or personal assets. We request these communications remain confidential to protect the reputations of anyone innocently accused. We fully trust that the appropriate action can and will be taken without
 
 *151
 
 the necessity of the Stakeholders of Burke County having to seek legal counsel[.]
 

 (Emphasis omitted).
 

 At the 11 April 2011 Board meeting, which Wood did not attend, Carlton handed out the envelopes. Without Thomas's promise of confidentiality, Wood would not have compiled or submitted the information.
 

 In November 2011, Morgan sued Plaintiffs for defamation of character. Prior to the suit, Wood did not know the Board broke the confidentiality of the letter. Three newspapers, a radio station, and a local blogger covered the lawsuit. The media coverage was "embarrassing" and "humiliating" and "destroyed [his] reputation." Clients stopped using his photography business because "[n]obody wants to be associated with, with that."
 

 Plaintiffs called Donald Vaughan and tendered him as an expert in the field of state and local government administration and leadership. Vaughan reviewed Plaintiffs' complaint, Defendant's answer, affidavits, and depositions. Vaughan also reviewed the applicable statutes. Vaughan explained the difference between open and closed Board sessions,
 
 *183
 
 specifically stating "the information that is brought into that [closed] session is expected to be closed." He opined "a citizen ought to be able to rely on the promise of a chairman of the board."
 
 [6]
 

 Plaintiff Carlton testified on his own behalf. Carlton lived in Burke County and owned Express Lube and Wash, a car maintenance business. Carlton had one son, who attended school in Burke County. In 2011, Carlton attended several Board meetings. Stellar, the superintendent at the time, discussed closing schools in Burke County, claiming the Board suffered from a deficit. However, in June 2011, financial records showed the county actually had a ten to twelve million dollar surplus.
 

 On 28 March 2011, Carlton could not attend a Board meeting, but Wood spoke on his behalf. After the meeting, Plaintiffs compiled an envelope to give to the Board about issues with Stellar. Carlton thought the information needed to be confidential for two reasons-to protect the people mentioned and to protect Plaintiffs from retaliation. Carlton attended the Board meeting on 11 April 2011. Before the meeting began, pursuant to Board procedures, Carlton gave eight envelopes to the Board's secretary for distribution to Board members.
 

 On 18 August 2011, the Board bought out Stellar's contract, releasing him prior to the end of his contract. The next morning, Morgan resigned. Carlton first learned of the breach of confidentiality and Morgan's lawsuit through rumors online. After reading about the suit on a local blogger's website, a deputy served Carlton with the complaint at his business, in front of customers. Three newspapers, a radio station, and a local blogger covered the lawsuit. As a result of the suit and coverage, Carlton resigned from his deaconship at his church. Longstanding customers stopped coming to Carlton's business. Consequently, Carlton closed the car wash portion of his business
 

 Plaintiff called Catherine Thomas, a former member and Chair of the Board. In fall 2010, the Board hired an outside attorney, Chris Campbell, to investigate complaints about Stellar. In a closed session on 22 November 2010, Campbell reported his findings to the Board and the Board's attorney. After his report, the Board gave "[t]hose documents" back to Campbell, to store at his office, so they did not become public.
 

 *184
 
 On 28 March 2011, the Board held an open session. Wood spoke at the session, first about schools closing and then about Stellar and Morgan. Thomas interrupted Wood and told him, "You can't discuss personnel matters in, in public like that." Thomas told Wood he could finish his speech during a closed session. When Wood later attended a closed session, "he complained about Dr. Stellar ... [and] probably talked about Amy Morgan as well[,]" though Thomas did not recall "specifically" what Wood said. The closed session ended before Wood could finish his speech. Thomas instructed Wood to "put it in writing and submit it confidentially."
 

 *152
 
 It was Thomas's "intention" to tell Wood to "submit it so that it could be reviewed in closed session[.]"
 
 [7]
 
 At that time, Thomas did not expect that the information Wood gave would be turned over to Stellar.
 

 At the next Board meeting, on 11 April 2011, each Board member's seat had an envelope marked "Confidential." Inside the envelope, Board members found a cover letter and other documents "that detailed allegations about Dr. Stellar and Ms. ... Amy [Morgan.]" During a following closed session, Thomas read the materials. When other members asked what to do with the envelope, Thomas replied, "It's confidential and we'll discuss it later." Additionally, "[t]he school board knew that personnel matters were confidential and had been trained on that many times." Thomas gave her envelope to attorney Campbell. Other members of the Board took the envelope and documents home.
 

 Sometime after the meeting, Thomas asked Campbell to investigate the allegations in the report. On 25 April 2011, Campbell reported his findings in a closed session, without Stellar present. The Board did not take any action on the allegations at that meeting.
 

 In August 2011, the Board decided to buy out Stellar's contract. The next day, Morgan resigned from her position. Thomas did not "think" the Board took any adverse action against Morgan. Thomas voted in favor of buying out Stellar's contract, in part based on the allegations in the envelope Plaintiffs submitted. On 31 October 2011, Thomas learned the documents became public because of a local blog. However, she did not give the documents to anyone besides Campbell.
 

 Plaintiff next called Susan Stroup, a former Board member. At the March 2011 closed session, Wood, amongst others, lodged complaints against Stellar. When asked about the complaints she heard from others and if Wood specifically mentioned an inappropriate relationship
 
 *185
 
 between Stellar and Morgan, Stroup answered, "I don't remember that specifically. I just --. I just know that it was directed towards Dr. Stellar's -- lots of things about him, just various issues about him. Inappropriate relationships, as well as, other things, but I, I don't remember exactly what it was."
 

 At the 11 April 2011 meeting, Stroup found an envelope marked "Confidential" in her seat. She was not surprised to see an envelope in her seat, because Stellar often left packets out for Board members. Stroup "glanc[ed]" at the documents, which did not contain any information she did not already know. The information "was pretty common knowledge[.]" Stroup took the documents home with her. However, another Board member, Rob Hairfield, left his envelope on the desk. Hairfield, due to health difficulties, often left things on his desk, and Stellar's secretary "usual[ly]" got what Hairfield left. Stroup could not specifically remember if the secretary picked up Hairfield's envelope at the April 2011 meeting. The Board never voted to keep the documents away from Stellar and Morgan. After her last Board meeting, Stroup gave the envelope and documents to "the central office to the superintendent's secretary."
 

 Plaintiffs rested.
 
 [8]
 
 Defendant moved for directed verdict. The trial court denied the motion for directed verdict.
 

 Defendant called Robert Armour, a current member of the Board. At the 11 April 2011 meeting, Armour saw an envelope in his chair. Armour did "nothing" with the materials at the meeting and took the envelope home. At home, he opened the envelope and read documents "that implied ... that referred to rumors and conjecture" he already heard about Stellar and Morgan. Armour did not give the documents to another.
 

 Armour also described Board practice during closed sessions. When in closed session, the Board members "are trained ... to keep whatever goes on in closed session meeting quiet." "Quiet" means "[n]ot to discuss it with anyone else outside the meeting." However,
 
 *153
 
 at the meeting, the Board did not explicitly vote to keep the information Plaintiffs gave confidential.
 

 Defendant called Karen Sain, another former Board member. Sain attended the 11 April 2011 Board meeting and received the envelope from Plaintiffs. She opened the envelope at the meeting, but did not review it there. Sain took the envelope and documents home and burned
 
 *186
 
 them. The Board did not vote to keep the documents confidential or from Stellar. Sain also described how the Board acts in closed sessions. Specifically, Sain testified the chairperson cannot make a decision on her own, as the Board "perform[s] as a body."
 

 Defendant called Samuel Wilkinson, a member of the Board. Wilkinson attended the 11 April 2011 meeting. However, Wilkinson did not "specifically remember receiving" the envelope and documents, though he was "sure that packet was delivered." He also did not remember receiving anything from Plaintiffs. He did not give any materials received as a member of the Board to Stellar or Morgan.
 

 Defendant called Timothy Buff, another former Board member. Buff attended the 11 April 2011 meeting, where there was an envelope in his seat. Buff did not review the materials at the meeting and took the envelope home. At the meeting, Thomas did not say the information in the envelope must remain confidential, and the Board did not vote to keep the information confidential. Buff did not give the envelope to anyone.
 

 Defendant called Chris Campbell. Campbell did not work "in-house" as the Board's attorney, but as "an independent attorney hired for legal matters." In 2010, the Board hired Campbell to investigate Stellar. In April 2011, Campbell received one of the envelopes distributed to Board members. In August 2011, Stellar asked Campbell for copies of complaints "made against him in the process of the review[.]" Campbell did not consult with the Board and sent Stellar the cover letter and other documents which were in the envelopes Plaintiffs compiled. Campbell considered the complaint to be a part of Stellar's personnel file.
 

 Defendant rested and renewed its motion for directed verdict. The court denied the motion.
 
 [9]
 
 The jury found Defendant liable for invasion of privacy and negligent infliction of emotional distress as to both Plaintiffs. The jury awarded Plaintiffs $250,000 each. On 12 October 2016, the trial court entered judgment in accordance with the jury verdicts.
 

 On 24 October 2016, Defendant filed a motion for judgment notwithstanding the verdict and a motion for new trial, pursuant to Rule 59(a)(1), (7)-(9). On 16 November 2016, Plaintiffs filed a motion for recovery of litigation costs and expenses. On 22 November 2016, the court held a hearing on the parties' motions. After argument, the court denied Defendant's motions. The court awarded Plaintiffs $4,281.85 in costs and expenses.
 

 *187
 
 The same day, the court entered orders in accordance with its oral rulings. On 20 December 2016, Defendant filed notice of appeal.
 

 II. Jurisdiction
 

 Our Court has jurisdiction pursuant to
 
 N.C. Gen. Stat. §§ 1-277
 
 (a), 7A-27(b)(1) (2017).
 

 III. Standard of Review
 

 We apply several standards of review to examine Defendant's appeal.
 

 First, we review a trial court's determination on sovereign immunity
 
 de novo
 
 .
 
 [10]
 

 White v. Trew
 
 ,
 
 366 N.C. 360
 
 , 362-63,
 
 736 S.E.2d 166
 
 , 168 (2013) (citations omitted) ("[A]lthough not explicitly stated previously, it is apparent that we have employed a de novo standard of review in other cases involving sovereign immunity.").
 

 *154
 
 Second, the standard of review for a Rule 12(b)(6) motion to dismiss is
 
 de novo
 
 .
 
 Leary v. N.C. Forest Prods., Inc.,
 

 157 N.C. App. 396
 
 , 400,
 
 580 S.E.2d 1
 
 , 4 (2003). We use the same standard of review for the denial of a motion for directed verdict and the denial of a motion for judgment notwithstanding the verdict.
 
 Tomika Invs., Inc. v. Macedonia True Vine Pentecostal Holiness Church of God, Inc.
 
 ,
 
 136 N.C. App. 493
 
 , 498-99,
 
 524 S.E.2d 591
 
 , 595 (2000) (citation omitted). The standard is "whether the evidence, taken in the light most favorable to the non-moving party, is sufficient as a matter of law to be submitted to the jury."
 
 Davis v. Dennis Lilly Co.
 
 ,
 
 330 N.C. 314
 
 , 322-23,
 
 411 S.E.2d 133
 
 , 138 (1991) (citing
 
 Kelly v. Int'l Harvester Co.
 
 ,
 
 278 N.C. 153
 
 ,
 
 179 S.E.2d 396
 
 (1971) ).
 

 In determining the sufficiency of the evidence to withstand a motion for a directed verdict, all of the evidence which supports the non-movant's claim must be taken as true and considered in the light most favorable to the non-movant, giving the non-movant the benefit of every reasonable inference which may legitimately be drawn therefrom and resolving contradictions, conflicts, and inconsistencies in the non-movant's favor.
 

 Turner v. Duke Univ.
 
 ,
 
 325 N.C. 152
 
 , 158,
 
 381 S.E.2d 706
 
 , 710 (1989) (citation omitted).
 

 *188
 
 There must be more than a "scintilla of evidence supporting each element of the non-movant's claim."
 
 Denson v. Richmond Cty.
 
 ,
 
 159 N.C. App. 408
 
 , 412,
 
 583 S.E.2d 318
 
 , 320 (2003) (quotation marks and citation omitted). "A scintilla is some evidence, and is defined by this Court 'as very slight evidence.' "
 
 Mace v. Pyatt
 
 ,
 
 203 N.C. App. 245
 
 , 251,
 
 691 S.E.2d 81
 
 , 87 (2010) (some quotation marks and citation omitted). "If there is evidence to support each element of the nonmoving party's cause of action, then the motion for directed verdict and any subsequent motion for [judgment notwithstanding the verdict] should be denied."
 
 Green v. Freeman
 
 ,
 
 367 N.C. 136
 
 , 140-41,
 
 749 S.E.2d 262
 
 , 267 (2013) (quotation marks, citation, and alteration omitted). We review the trial court's denial
 
 de novo
 
 .
 
 Denson
 
 ,
 
 159 N.C. App. at 411
 
 ,
 
 583 S.E.2d at 320
 
 (citation omitted).
 

 Third, "an appellate court's review of a trial judge's discretionary ruling either granting or denying a motion to set aside a verdict and order a new trial is strictly limited to the determination of whether the record affirmatively demonstrates a manifest abuse of discretion by the judge."
 
 Worthington v. Bynum
 
 ,
 
 305 N.C. 478
 
 , 482,
 
 290 S.E.2d 599
 
 , 602 (1982) (citations omitted). "Consequently, an appellate court should not disturb a discretionary Rule 59 order unless it is reasonably convinced by the cold record that the trial judge's ruling probably amounted to a substantial miscarriage of justice."
 
 Id.
 
 at 487,
 
 290 S.E.2d at 605
 
 . However, if the motion for a new trial is based on an error in law occurring at the trial and objected to by the party making the motion, our Court reviews
 
 de novo
 
 .
 
 Greene v. Royster
 
 ,
 
 187 N.C. App. 71
 
 , 78,
 
 652 S.E.2d 277
 
 , 282 (2007) (citations omitted).
 

 IV. Analysis
 

 Defendant contends the trial court erred in the following ways: (1) denying its motion to dismiss based on immunity; (2) denying its motion to dismiss for failure to state a claim, motion for directed verdict, and motion for judgment notwithstanding the verdict; (3) denying its motion for new trial; and (4) awarding Plaintiffs costs and expenses.
 

 A. Motion to Dismiss Based on Sovereign Immunity
 

 Defendant first contends the court erred by denying its motion to dismiss based on immunity. In its brief, Defendant asserts sovereign immunity barred both the invasion of privacy and negligent infliction of emotional distress claims. At oral argument, however, Defendant conceded it failed to argue below sovereign immunity barred Plaintiffs' claim for negligent infliction of emotional distress. Thus, Defendant's argument as to the negligence claim is not properly before this Court, and we do not address it. For reasons stated
 
 infra
 
 , we need not address
 
 *189
 
 whether Defendant's argument that sovereign immunity barred Plaintiffs' invasion of privacy claim would have been meritorious.
 
 *155
 

 B. Motion to Dismiss Based on Failure to State a Claim, Motion for Directed Verdict, and Motion for Judgment Notwithstanding the Verdict
 

 Defendant next contends the trial court erred by denying its motions to dismiss pursuant to Rule 12(b)(6), for directed verdict, and for judgment notwithstanding the verdict. Defendant argues Plaintiffs failed to present sufficient evidence of duty, breach of duty, and reasonable foreseeability in support of their claim for negligent infliction of emotional distress.
 

 First, Defendant argues it did not, and could not, owe Plaintiffs any duty for three reasons: (1) the documents submitted (and information contained therein) were public information; (2) the closed nature of the Board session did not mean the matters were confidential; and (3) Thomas's assertions of confidentiality did not bind the Board because she acted alone. Plaintiffs contend a duty arose from the circumstances.
 

 Vaughan, Plaintiffs' expert on state and local government and administration and leadership, testified:
 

 BY [PLAINTIFFS' COUNSEL]:
 

 Q. Well, let me just ask you, in terms of the closed session in this case, could you explain what we're talking about and how that impacts --
 

 A. Sure.
 

 Q. -- the issues in this case?
 

 A. In a closed session, information is presented to a body without the public being in. The public could be in this particular meeting. They could, could fill the whole courthouse if they were interested enough in this particular case. A closed session is the participants in the closed meeting of, of the board. In this case they had requested that their information be held confidential.
 

 [DEFENDANT'S COUNSEL]: Objection. Move to strike.
 

 THE COURT: Sustained. Motion to strike is allowed as to the "keep it confidential." Next question, please.
 

 *190
 
 BY [PLAINTIFFS' COUNSEL]: Q. Let me ask you, in this case is it typical when a, a school board or any public entity wants to go into closed session, they have to make a motion to go into closed session and that has to be voted on by the school board?
 

 A. That's correct. The statutes are pretty specific. Closed sessions are a rare animal. Ninety -- I would guess 90 percent of, of all -- 95 percent of all sessions of every board, board meeting in North Carolina this week would be in open session. There are just particular things that allow a board to go into closed session.
 

 Q. Okay. And in this case the board went into closed session --
 

 A. That's correct.
 

 Q. -- correct? And then once the board went into closed session, tell the jury about the importance of citizens being able to share information with a school board or city council or county commissioners in closed session.
 

 A. It's --
 

 Q. What, what does that mean?
 

 A. It's the reason -- It's the whole basis of democracy. You have elected the people on a school board to represent you and your best interest on school-board-type related matters. They are the people's representative, and they make the decisions based on the information that they have.
 

 And it's the right of citizens, it's the basic tenant of government in North Carolina, that, that citizens can go before those boards and express their concerns, grievances, whatever they want to express. That's, that's why we have government and not monarchs and dictators and other things. That's why we have the government the way we have it in North Carolina.
 

 Q. Okay. And once the citizens go before a governmental entity like a school board in closed session and whatever statements they make or discussions there are in that closed session, is that information that they say or people
 
 *191
 
 question, promises made -- is that information that would be open or public or would that information be --
 

 A. "Closed" means closed.
 

 [DEFENDANT'S COUNSEL]: Objection, Your Honor. Move to strike.
 

 *156
 
 THE COURT: Overruled.
 

 BY [PLAINTIFFS' COUNSEL]:
 

 Q. Go, go ahead and explain your answer.
 

 A. Closed sessions are closed sessions. They are not open to the public. And the information that is brought into that session is expected to be closed.
 

 Q. Now, let me ask you this: Assuming that the evidence in this case will tend to show by its greater weight that during the first closed session in which Mr. Wood made a presentation to the Burke County Board of Education in their closed session and made a statement that he wanted whatever information he shared or gave to the school board to be kept in confidence, do you have an opinion satisfactory to yourself as to whether or not during the course of that actual session that if the chairperson of the school board told him that the information would be kept confidential that he could rely on her promise?
 

 [DEFENDANT'S COUNSEL]: Objection, Your Honor.
 

 THE COURT: Sustained as to the form.
 

 [PLAINTIFFS' COUNSEL]: Okay.
 

 BY [PLAINTIFFS' COUNSEL]:
 

 Q. State whether or not in a closed session that citizens can rely on a promise of confidentiality by the chair of, of a school.
 

 [DEFENDANT'S COUNSEL]: Objection, Your Honor.
 

 THE COURT: Sustained as to the form.
 

 BY [PLAINTIFFS' COUNSEL]:
 

 Q. Just explain to us the significance of a -- the closed session as it relates to whatever is promised or said in a closed session by the chairman of the governmental --
 
 *192
 
 A. I think a citizen ought to be able to rely on the promise of the chairman of a board.
 

 [DEFENDANT'S COUNSEL]: Objection. Move to strike. Your Honor, may we approach?
 

 THE COURT: Yes. Wait one second. The response is nonresponsive to the question. Restate your question. Listen to the question. Answer the question. The question again, please.
 

 BY [PLAINTIFFS' COUNSEL]:
 

 Q. Well, the question is: Explain to the jury how the closed session relates to any statements made in closed session by the citizens going before the, the governmental body or any statements made by the chairman of, of a school board or any promises made by the chairman of the school board. How, how do those two things fit together?
 

 [DEFENDANT'S COUNSEL]: Objection, Your Honor.
 

 THE COURT: Overruled as to that. You may answer to that limited question. Answer, please.
 

 BY [PLAINTIFFS' COUNSEL]:
 

 A. Should be able to rely on it. That's the whole basis--
 

 Additionally, Thomas instructed Wood to submit the information confidentially. Plaintiffs both testified about how the promise of confidentiality influenced their decision to submit the letter and supporting documents. Plaintiffs marked "
 
 Confidential
 
 " on the front of each envelope and asked for confidentiality in the letter. Wood testified he began his speech during the closed session by saying he wanted to bring forward "sensitive issues" and "needed to know that they could be kept confidential." Former Board member, Robert Armour, testified when in closed session, Board members "are trained ... to keep whatever goes on in closed session meeting quiet." "Quiet" means "[n]ot to discuss it with anyone else outside the meeting." After reviewing the evidence in the light most favorable to the non-movant Plaintiffs, we conclude Plaintiffs produced sufficient evidence of Defendant's duty owed.
 
 [11]
 

 *157
 

 *193
 
 Second, Defendant argues Plaintiffs failed to present more than a scintilla of evidence Defendant breached any duty. Specifically, Defendant contends Plaintiffs only presented evidence showing attorney Campbell, who did not work as the Board's attorney at the time, gave Stellar Plaintiffs' identities. Defendant further argues that at trial, Plaintiffs proceeded under a "fail[ure] to secure" theory of negligence-that Defendant failed to properly secure the confidential information. However, viewing the evidence in the light most favorable to Plaintiffs and resolving all contradictions in Plaintiffs' favor, we conclude Plaintiffs presented sufficient evidence-more than mere speculation-Defendant breach its duty to keep Plaintiffs' identities confidential.
 

 Finally, Defendant argues Plaintiffs failed to present sufficient evidence of the reasonable foreseeability they would suffer severe emotional distress. Defendant points to evidence Wood attempted to openly discuss Stellar's and Morgan's alleged behavior and relationship at the 28 March 2011 Board meeting. Our review of the evidence, in the light most favorable to Plaintiffs, reveals sufficient evidence of reasonable foreseeability. Plaintiffs explicitly marked "
 
 Confidential
 
 " on each envelope and stated several times in the letter their request for confidentiality. Wood testified when he attended the Board's closed session, he told the Board he needed to discuss "sensitive issues" and "needed to know
 
 *194
 
 that they could be kept confidential." Chairperson Thomas replied, "[T]hat's fine[.]" Wood also testified without Thomas's promise of confidentiality, he would not have submitted the letter. Thus, we conclude Plaintiffs presented sufficient evidence of reasonable foreseeability of emotional distress.
 

 Accordingly, the trial court did not err by denying Defendant's motion to dismiss, motion for direct verdict, or motion for judgment notwithstanding the verdict for Plaintiffs' negligent infliction of emotional distress claim.
 
 [12]
 
 Below, the jury awarded both Plaintiffs $250,000 for both negligent infliction of emotional distress and invasion of privacy. The verdict sheets show the jury awarded the full amount for both claims to both Plaintiffs and did not divide the amount between the two claims. Thus, we need not analyze Defendant's motions as to the invasion of privacy claim, for the judgment still stands, as we affirm the trial court's denial of Defendant's motions as to the negligence claim.
 

 C. Motion for New Trial
 

 Defendant next argues the trial court erred by denying its motion for new trial because the court "allowed inadmissible and highly prejudicial testimony and instructed the jury on an unsupported theory of negligence." (All capitalized in original). Defendant's argument is three-fold and concerns: (1) testimony on lost future profits; (2) instructing the jury on failure to secure information; and (3) "[p]rejudicial and [i]rrelevant" testimony.
 

 i. Carlton's Testimony on Lost Profits
 

 Defendant and Plaintiffs disagree as to whether Defendant preserved this argument
 
 *158
 
 as a ground for its motion for new trial and on appeal. Defendant asserts it preserved the issue on appeal because it filed and argued a motion
 
 in limine
 
 and objected during Carlton's testimony. However, as argued at the trial court, Defendant did not base its motion
 
 in limine
 
 on the same grounds now argued on appeal. Below, Defendant argued Carlton was not an expert and did not give Defendant his 2015 tax return. During Carlton's testimony, Defendant did object several times, but, again, not on the grounds argued on appeal. N.C. R. App. P. 10(a)(1) (2017) ("In order to preserve an issue for appellate review, a party must have presented to the trial court a timely ... motion, stating the specific grounds for the ruling the party desired the court to make[.]"). Defendant contended some numbers were based on
 
 *195
 
 speculation, Carlton was not an expert, and Plaintiffs' counsel impermissibly asked leading questions. Defendant did not object to Carlton's testimony (or to jury instructions) that "lost business profits are not a proper measure of damage in this type of tort case." Accordingly, Defendant did not present this argument below, and it not properly before us on appeal.
 

 ii. Theory of Negligence Outside the Pleadings
 

 Defendant next argues the trial court erred in instructing the jury on failure to secure the information when Plaintiffs did not include this theory of negligence in their pleadings. Defendant further contends this theory "was directly contrary to the only basis alleged for their claim-that a Board member actively gave the information to Stellar." At the outset, Plaintiffs pled multiple theories, two of which were an intentional act by the Board and negligence by the Board. In their complaint, Plaintiffs did not limit their allegation of a negligent act to a specific act. Plaintiffs' complaint alleges "Defendants committed a negligent act[.]" Thus, the negligent act Plaintiffs forwarded at trial (failure to secure information) was within the pleadings, as the pleadings were not limited.
 
 [13]
 

 iii. Prejudicial and Irrelevant Testimony
 

 Defendant contends "[t]he trial court continually allowed highly inflammatory and irrelevant testimony about Stellar which had nothing to do with the legal issues and which, taken together, painted a negative picture of the management of the school system which easily could have colored the jury's view of the Board." Defendant specifically points to five portions of testimony. However, Defendant did not include three of the five portions in its motion for new trial (points one, three, and five). As for the two portions of testimony properly before this Court, we reviewed the record below and conclude neither warrants a new trial. Accordingly, we affirm the trial court's order denying Defendant's motion for new trial.
 

 D. Costs and Expenses
 

 Lastly, Defendant contends "[a]s the Board was entitled to dismissal, and/or directed verdict and/or JNOV and/or new trial, plaintiffs were not entitled to costs and expenses." As stated above, we hold the
 
 *196
 
 trial court properly denied Defendant's motions for dismissal, directed verdict, judgment notwithstanding the verdict, and new trial. Thus, the trial court did not err in awarding Plaintiffs costs and expenses.
 

 V. Conclusion
 

 For the foregoing reasons, we affirm the trial court's orders and judgment.
 

 AFFIRMED.
 

 Judges BRYANT and ARROWOOD concur.
 

 [1]
 

 Plaintiffs initially included Dr. Arthur Stellar as a defendant, but dismissed, without prejudice, their claims against Stellar on 17 March 2016.
 

 [2]
 

 The complaint did not state who chaired the Board.
 

 [3]
 

 Plaintiffs filed a written version of their objection on 2 June 2016.
 

 [4]
 

 The court originally called the case for trial on or about 8 June 2016. However, on 29 June 2016, the court declared a mistrial.
 

 [5]
 

 Wood did not testify about which Board member interrupted his statement.
 

 [6]
 

 Defendant objected and moved to strike this portion of Vaughan's testimony. The court had Plaintiffs' counsel reword the question and instructed Vaughan to answer "that limited question." Vaughan answered, "Should be able to rely on it."
 

 [7]
 

 This wording is from Plaintiffs' counsel's question, to which Thomas responded in the affirmative.
 

 [8]
 

 Plaintiffs also called five other witnesses, but their testimonies are not pertinent to the issues on appeal.
 

 [9]
 

 Plaintiffs moved for directed verdict on Defendant's defense of contributory negligence. The court granted Plaintiffs' motion.
 

 [10]
 

 We note whether sovereign immunity is a challenge to personal jurisdiction or subject matter jurisdiction is unsettled in North Carolina law.
 
 See
 

 M. Series Rebuild, LLC v. Town of Mount Pleasant, Inc.
 
 ,
 
 222 N.C. App. 59
 
 , 62,
 
 730 S.E.2d 254
 
 , 257 (2012) (citations omitted) ("A motion to dismiss based on sovereign immunity is a jurisdictional issue; whether sovereign immunity is grounded in a lack of subject matter jurisdiction or personal jurisdiction is unsettled in North Carolina.").
 

 [11]
 

 Defendant also contends the Public Records Act required it to provide Stellar and Morgan with their personnel files, which included Plaintiffs' identities. N.C. Gen. Stat. § 115C-319 defines a personnel file as:
 

 Personnel files of employees of local boards of education, former employees of local boards of education, or applicants for employment with local boards of education shall not be subject to inspection and examination as authorized by G.S. 132-6. For purposes of this Article, a personnel file consists of any information gathered by the local board of education which employs an individual, previously employed an individual, or considered an individual's application for employment, and which information relates to the individual's application, selection or nonselection, promotion, demotion, transfer, leave, salary, suspension, performance evaluation, disciplinary action, or termination of employment wherever located or in whatever form.
 

 N.C. Gen. Stat. § 115C-319 (2017).
 

 Defendant argues because Plaintiffs asked the Board to terminate or put Stellar and Morgan on leave, the letter (and Plaintiffs' identities) were a part of Stellar's and Morgan's personnel files. In a footnote, Defendant argues the information was not confidential because Stellar has a "right to judicial review of the reasons and validity of his removal." Plaintiffs argue "[t]he information submitted by Plaintiffs does not relate to any promotion, demotion, [or] termination ...." Plaintiffs argue the Board bought out Stellar's contract-did not demote or terminate him-and Morgan resigned. While Defendant is correct Stellar would have a right to his personnel file, Plaintiffs made clear in their letter and at the trial court the confidential information was not just the allegations within the letter, but also Plaintiffs' identities as the source of the information. Indeed, the cover letter explicitly stated, "please consider the source of all items herein to be anonymous or strictly confidential." Thus, the Board could inform Stellar of the reasons for the buyout, without disclosing Plaintiffs' confidential information-their identities.
 

 [12]
 

 We conclude the allegations in Plaintiffs' complaint, taken as true, were sufficient to withstand Defendant's motion to dismiss for failure to state a claim.
 

 [13]
 

 Defendant is correct in its assertion Plaintiffs pled "That upon information and belief, around the early part of August, 2011 when Dr. Stellar was still Superintendent of the Board, he leaked a copy of the confidential packet to Amy Morgan." However, Plaintiffs also asserted a broad claim of negligence in their complaint.